UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
THE LAW FIRM OF HUGH H. MO, P.C.,

                         Plaintiff,

    v.

NG LAP SENG ALSO KNOWN AS DAVID NG,

                         Defendant.

Case No.: 1:20-cv-07077-AKH

-------------------------------------------------------------------X
NG LAP SENG ALSO KNOWN AS DAVID NG,

                         Third-Party Plaintiff,

    v.

HUGH H. MO,

                         Third-Party Defendant.

-------------------------------------------------------------------X
NG LAP SENG ALSO KNOWN AS DAVID NG,

                         Counterclaim Plaintiff,

    v.

THE LAW FIRM OF HUGH H. MO, P.C.,

                         Counterclaim Defendant.
-------------------------------------------------------------------X

**DEFENDANT AND COUNTERCLAIM/THIRD-PARTY PLAINTIFF NG LAP SENG'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR LEAVE TO TAKE THIRD PARTY DEPOSITIONS**

Cohen Tauber Spievack & Wagner P.C.
420 Lexington Avenue, Suite 2400
New York, NY 10170
Tel.: (212) 586-5800

*Attorneys for Ng Lap Seng*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii
PRELIMINARY STATEMENT ............................................................................................. 1
STATEMENT OF FACTS ...................................................................................................... 3
ARGUMENT ......................................................................................................................... 10
I.   THE DISCOVERY SOUGHT BY NG IS RELEVANT TO THE CLAIMS AND
     DEFENSES IN THIS ACTION ................................................................................... 10
   A.  The Federal Rules of Civil Procedure Provide for Broad Discovery ................... 10
   B.  Ng will be Prejudiced if he is not Permitted to Take Discovery from His Former
       Attorneys ............................................................................................................... 12
CONCLUSION ..................................................................................................................... 16

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Beverly Hills Teddy Bear Co. v. Best Brands Consumer Products, Inc.*,
   1:19-CV-3766-GHW, 2020 WL 7342724 (S.D.N.Y. Dec. 11, 2020) ...................................10

*Convermat Corp. v. St. Paul Fire and Marine Ins. Co.*,
   CV 06-1045 JFB AKT, 2007 WL 2743696 (E.D.N.Y. Sept. 18, 2007) ..................................11

*Doe v. Town of Greenwich*,
   3:18CV01322(KAD), 2020 WL 2390979 (D. Conn. Jan. 10, 2020) ................................15, 16

*Jeffrey L. Rosenberg & Assocs., LLC v. Candid Litho Printing, Ltd.*,
   76 A.D.3d 510 (2d Dep't 2010) .............................................................................................13

*McCoy v. Energy XXI GOM, L.L.C.*,
   695 Fed. Appx. 750 (5th Cir. 2017) .......................................................................................15

*Miller v. Sam Houston State U.*,
   986 F.3d 880 (5th Cir. 2021) .................................................................................................15

*Pisani v. Westchester County Health Care Corp.*,
   05 CIV.7113 (WCC), 2007 WL 107747 (S.D.N.Y. Jan. 16, 2007) ........................................15

*In re Pursuit Holdings (NY), LLC*,
   18-12738 (MG), 2021 WL 163083 (Bankr. S.D.N.Y. Jan. 15, 2021) .....................................11

*In re Rapid-Am. Corp.*,
   13-10687 (SMB), 2018 WL 882398 (Bankr. S.D.N.Y. Feb. 12, 2018) ..................................15

*S.E.C. v. Rajaratnam*,
   622 F.3d 159 (2d Cir. 2010) ...................................................................................................11

*Tri-Star Pictures, Inc. v. Unger*,
   171 F.R.D. 94 .........................................................................................................................11

*US Bank Nat. Ass'n v. PHL Variable Ins. Co.*,
   12 CIV. 6811 CM JCF, 2012 WL 5395249 (S.D.N.Y. Nov. 5, 2012) ...................................15

**Statutes**

Fed. R. Civ. P. 26 .............................................................................................10, 11, 12, 15

Fed. R. Civ. P. 30 ...............................................................................................................11, 15

Defendant and Counterclaim/Third-party Plaintiff Ng Lap Seng ("Ng") submits this memorandum of law in support of his motion for leave to take third party depositions.

## PRELIMINARY STATEMENT

Ng, then a 68-year-old resident and citizen of China, was arrested by federal agents on September 25, 2015 at the airport as he was on his way back to his home in Macau. Ng, who does not speak or understand English, was incarcerated at the Manhattan Detention Center ("MDC") and eventually visited by Hugh H. Mo ("Mo"), the sole owner of the Law Firm of Hugh H. Mo P.C. (the "Mo Firm"). Mo represented to Ng that he had the requisite knowledge and experience to handle a case of this complexity and that he would perform all of the services that were set forth in the engagement letters he later prepared. Ng therefore agreed to retain the Mo Firm to represent him in the criminal action and to pay the demanded fixed fee. The Mo Firm demanded a fixed fee of a total of $6 million ($1 million for the bail hearing, $2 million for pre-trial work and $3 million for trial and, if applicable, sentencing).

Rather than perform the agreed upon legal services, the Mo Firm outsourced all of the legal services it was retained to perform and facilitated the retention of lawyers from multiple other law firms to perform every aspect of Ng's representation in the criminal matter. Ng paid the Mo Firm $4.1 of the 6 million fixed fee and learned that Mo had not in fact performed the services for which the fee was to be paid and did not have the requisite skill and ability to try a case of this magnitude.

The Mo Firm initiated this action against Ng alleging, *inter alia*, breach of contract and account stated, and demanding $1.9 million of the remaining amount of the fixed fee. Ng asserted counterclaims for fraud and breach of contract arising out of the misrepresentation of the ability to handle Ng's defense and the Mo Firm's failure to perform its obligations under the

agreements. Ng's counterclaims expressly allege that the majority of the legal work was performed by other lawyers for whom Ng paid separately, and that the Mo Firm played only a minor and non-substantive role. The Mo Firm denies this allegation and seeks to prevent Ng from collecting evidence that supports Ng's claims and defenses in this action.

The only deposition that Ng has been permitted to take in discovery is of Mo (who testified in his personal capacity and as the corporate representative of the Mo Firm). Ng should be afforded an opportunity to obtain evidence from all persons with relevant information—including the other attorneys who represented him—so that he can fully and fairly defend against the Mo Firm's allegations and to support his own claims against Mo and the Mo Firm. Ng requires this for at least the following reasons:

*First*, these lawyers have first-hand knowledge of the scope of the legal services performed on behalf of Ng in the criminal action and have knowledge regarding who performed those services. The Mo Firm did not work in a vacuum. It was part of a group of law firms working to represent Ng and while they may not have kept track of each other's time expenditures, they knew who was responsible for performing—*and did perform*—the various case-related tasks.

*Second*, the Mo Firm did not keep contemporaneous time records of the work it allegedly performed on behalf of Ng. It claims that boxes of case documents reflect the work it performed and that it can somehow create reconstructed time records to support its contention that it performed $6 million worth of work over the course of almost 3 years starting as far back as October 2015. At best, the case documents show the work performed on behalf of Ng in general and do not show that the Mo Firm was the firm that performed the work. Ng requires the

depositions of these other attorneys to determine which of the firms did the work for which the Mo Firm seeks to take credit.

*Third*, the Mo Firm claims to have overseen all aspects of the work performed by the other attorneys and to have been responsible for, and directed, the strategy. The other attorneys have direct knowledge of the role the Mo Firm played in allegedly overseeing their work and directing the case strategy.

For these reasons, and as further set forth below, Ng's motion for leave to depose the other attorneys who represented him in the criminal action should be granted.

## STATEMENT OF FACTS

On or about September 25, 2015, Ng was arrested and charged in a criminal indictment with making false statements to U.S. Customs Officers and bringing U.S. currency into the United States. He was incarcerated at the MDC in Brooklyn. (Tr.[1] 27:5-28:13). Ng was then a 68 year old citizen of China and resident of Macau. He did not and does not speak or understand English. Although initially represented by other counsel, Ng retained Brafman & Associates P.C. ("Brafman") after his arraignment.

On or about October 6 and 7, 2015, Hugh Mo visited Ng at MDC. At the October 7th meeting, Ng agreed to hire the Mo Firm in addition to Brafman. (Tr. 37:6-39:12). The initial engagement provided for Ng to pay the Mo Firm $1 million in two payments of $500,000 to represent him at the bail hearing. (Ex.[2] 2). Mo requested a $1 million fee for the bail hearing after asking Ng "what kind of fee he has in his mind." (Tr. 37:15-23). Ng told Mo that he had already agreed to pay Brafman $500,000 and indicated that he would pay the Mo Firm $500,000

---

[1] "Tr." refers to the transcript of the deposition of Hugh Mo, dated March 18, 2021, excerpts of which are attached to the affirmation of Sari E. Kolatch, dated May 21, 2021 ("Kolatch Aff."), at Ex. 1.
[2] "Ex. __" refers to the exhibits attached to the Kolatch Aff.

3

"just to get him out."³  (Tr. 40:16-41:7).  Mo told Ng that "if you're paying Mr. Brafman 500,000, I think I'm going to ask for more."  (Tr. 41:9-12).  Ng agreed to pay the Mo Firm an additional $ 500,000 once he was released on bail (for a total of $1 million).  (Tr. 41:13-16).

Mo is a former Assistant District Attorney.  He left the District Attorney's office in 1984 and was a deputy police commissioner until 1988.  (Tr. 17:13-19:12).  He is fluent in Mandarin.  (Tr. 28:14-17).  When he met Ng, only about thirty percent of Mo's practice consisted of criminal cases.  (Tr. 13:18-25:08).  Mo was the only attorney from the Mo Firm that worked on Ng's case.

On October 8, 2015, Ng entered into an engagement letter with the Mo Firm that provided for a payment of $1,000,000 "for the first phase of the criminal proceedings of securing an appropriate bail package for your release from detention in the total amount of One Million Dollars" with $500,000 payable immediately and "$500,000 payable immediately upon your release from detention or an appeal of a denial of bail" (the "Agreement") (Ex. 3).  At or around the time he entered into the Agreement, Ng sent a handwritten note to his daughter-in-law indicating that he wanted Mo to "handle the entire case" and that the other lawyers "will play an assisting role."  (Ex. 4).

Mo claims that he and Brafman "teamed up together to handle the detention hearing and the bail proceedings."  (Tr. 57:11-15).  Brafman's firm submitted the written submission to the Magistrate Judge, argued at the bail hearing before the Magistrate Judge on October 16, 2015, submitted the written submission to the District Court Judge in response to the Government's appeal of the bail, and argued the appeal before the District Court on October 22, 2015.  (Tr. 57:16-62:7).  During that two-week period, Mo contends that he met with Ng daily at MDC and

---

³ The initial $500,000 that Ng had paid to Brafman included pre-trial preparation.  Ng entered into a second retainer agreement with Brafman after the indictment.  (Ex. 2).

4

interviewed him about the case. (Tr. 58:3-21). The District Court modified the bail conditions set by the Magistrate Judge, but Ng was released on bail. At the conclusion of the two-week period—from the time Mo met Ng until the time Ng was granted bail and released—Ng had already paid the Mo Firm $1 million dollars. (Tr. 62:14-18).

**The Supplemental Engagement**

On November 1, 2015, shortly after his release on bail, Ng entered into a Supplemental Engagement Letter with the Mo Firm (the "Supplemental Agreement"). (Ex. 5) At or around this same period, the Government unsealed an indictment against Ng that included charges of money laundering, bribery, and violations of the Federal Corrupt Practices Act ("FCPA"). (Tr. 66:17-67:1).

In the Supplemental Agreement, the Mo Firm represented that, in exchange for $2,000,000, it would perform "all legal services related to pre-trial proceedings, including but not limited to investigation, interview of [Ng] and all prospective witnesses, meeting with the government prosecutors and co-counsel, all court appearance, discovery, motion practices, hearings and trial preparation." (Ex. 5). The Supplemental Agreement further provided that if the case did not resolve before trial, "an additional trial fee of $3,000,000 is to be paid in three installments" that would include the trial and "all services related to post-conviction services, including preparation of sentencing memorandum and sentencing hearing." (*Id.*)

Mo required a $5 million fee for the Supplement Engagement after Ng told him that he was paying Brafman a total of $4,000,000 through trial (which included the $500,000 that he had already paid) and another $350,000 for post-verdict proceedings and sentencing in the event of a conviction. Mo concluded that he would be doing "a lot more" than Brafman and therefore

5

demanded $5 million, in addition to the $1 million Ng already paid the Mo Firm. (Tr. 66:6-69:4).

**Additional Law Firms Join the "Team" Representing Ng**

Throughout the period from incarceration to post-conviction, Ng was represented by attorneys from other law firms whom he paid separately. Ng retained some of the firms, such as Brafman and later Kirkland & Ellis LLC ("Kirkland"), directly. Some of the firms were retained via the Mo Firm. (See Exs. 6, 7 and 8).

Brafman represented Ng from September 2015 until April, 2016[4]. In April 2016, simultaneously with Brafman's withdrawal from the case, Mo arranged for attorneys from Park Jensen Bennet ("PJB"), a firm with substantial white collar criminal defense experience, to represent Ng[5]. According to Mo, PJB was retained to do "a lot of the pre-trial work, as well as trial" and motion practice as required. (Tr. 96:19-97:25).

At Mo's request, PJB agreed to charge Ng a flat fee of $800,000 rather than an hourly rate.[6] (Tr. 95:2-97:13; Ex. 6).[7] In June 2016, the Mo Firm arranged for the retention of Shapiro Arrato LLP ("Shapiro") to join the defense team. Mo testified that Shapiro was brought in "as the law person" – the firm that was "going to be – primarily be responsible for legal research, as well as all legal issues" and was going to be drafting memorandums and motions "[a]long with the Tai Park firm and then with [Mo's] involvement." (Tr. 109:12-110:19). Shapiro's

---

[4] Three attorneys from Brafman appeared on the case. (See Ex. 9 at Docs. 25, 26, and 27).

[5] Three attorneys from PJB, partners Tai Park and Doug Jensen, and associate Christopher Greer, appeared on behalf of Ng. (Ex. 9 at Docs. 182, 183, 184).

[6] Given that the scope of work actually performed by PJB was far greater than initially expected, prior to the trial Ng agreed to pay PJB an additional $300,000. (Ex. 10).

[7] While PJB's retainer provided for a fixed fee, it nevertheless kept contemporaneous time records of the work it performed throughout its representation of Ng. (Kolatch Aff. ¶ 22).

engagement letter with the Mo Firm provided for payment based on an hourly rate. (Ex. 7). Throughout Shapiro's involvement, multiple attorneys from the firm worked on the case and it kept contemporaneous time records that were submitted to the Mo Firm which arranged for payment. (Tr. 112:11-113:8).

On July 1, 2016, the Mo Firm retained Herve Gouraige of the law firm of Sills Cummis & Gross P.C. ("Sills Cummis"). (Ex. 8 ). Gouraige was retained because of his expertise in international law, to review the motion to dismiss Shapiro was drafting, and to identify and secure expert witnesses. (Tr. 113:17-122:21). Sills Cummis kept contemporaneous time records which were submitted to the Mo Firm and reviewed by Mo. (Tr. 119:24-120:9).

In or about February 2017, Ng separately hired the law firm of Kirkland & Ellis LLP ("Kirkland"). Kirkland was initially retained to conduct plea negotiations with the Government. At the conclusion of the trial, Kirkland took over as lead counsel for Ng and was responsible for all post-verdict work, including the sentencing and appeal. (Tr. 193:11-194:04). Kirkland kept contemporaneous time records of its work.

**Pre-Trial Preparation**

Debra Sturman LLC was retained to prepare a white paper on the Foreign Sovereign Immunities Act ("FSIA"). In addition to the team of lawyers and document reviewers, two investigative firms conducted background investigations and interviews.

Email correspondence produced by the Mo Firm show that PJB was the firm that took the lead in drafting discovery requests to both the Government and to the United Nations, drafted a motion to compel production and communicated with the United Nations' counsel with respect to its discovery responses. (Exs. 11, 12).

7

Substantial and rolling document production by the Government were uploaded to Relativity, a litigation management software. (Tr. 98:18-99:07). Contemporaneous emails show that Brafman was initially responsible for overseeing discovery and PJB took over when they came into the case. (See Ex. 13). As many as ten contract lawyers from Yorkson Legal—including Chinese language reviewers—were hired to conduct document review. Email correspondence shows that PJB was the firm that circulated the document review protocol, proposed search terms, and reported on the status of the document review to the rest of the legal team. (Exs. 14, 15).

Mo claims to have participated in multiple meetings regarding the preparation of the document review protocol and search terms, and that he oversaw document review. (Tr. 103:25-106:03).

Between August 2016 and the conclusion of the criminal trial in July 2017 attorneys for Ng filed a Motion to Compel (Ex. 9, Doc.247), Motion to Suppress (*id*. Doc. 281), Motion to Dismiss and for a Bill of Particulars (*id*. Doc 274), Motion to Sever (*id*. Doc. 332) and Motions *in Limine* (*id*. 454). None were filed by the Mo Firm and email correspondence and invoices show that they were drafted by either PJB or Shapiro.

Email correspondence and court transcripts show that the firm that took the lead in drafting a particular motion or working on a particular matter was the firm that signed and filed the motion, participated in oral argument, or sent the disclosure. See e.g., Ex. 16 (email from PJB partner Tai Park complaining that Mo signed a brief prepared by PJB); Ex. 17 (email from PJB to Shapiro indicating that Shapiro should send the expert disclosure since that firm "did all the work in dealing with the experts").

8

The docket also shows that the majority of the correspondence with the Court, including substantive letter motions, were written by firms other than the Mo Firm. The Mo Firm's limited correspondence with the Court generally pertained to Ng's bail conditions. (See e.g., 9 at Docs. 304, 308, 396, 449).

**Trial**

The trial commenced with jury selection on June 26, 2017, with a verdict on July 27, 2017. Tai Park of PJB was lead counsel and delivered the opening and closing statements. (Tr. 184: 11-22). Attorneys from PJB cross examined 13 of the 15 witnesses, with Mo cross examining the other two witnesses. (*Id*. 184:23-187:05). Legal arguments and legal submissions, including proposed jury instructions, proposed verdict sheet, and a memorandum on foreign law, were prepared and argued by Shapiro. (See e.g., Ex. 9 Docs. 552, 555).

**Post-Verdict**

At the conclusion of the trial, Ng hired Kirkland to take over as lead counsel for sentencing and other post-trial motions and appeal. (Tr. 193:23-194:01.)

**Payments Made by Ng**

Ng paid the following for the pre-trial preparation, investigative work, and trial.

| Paid to | Amount |
|---|---|
| The Mo Firm | $ 4,100,000 |
| Brafman | $ 1,500,000 |
| PJB | $ 1,500,000 |
| Shapiro | $ 828,959 |
| Sills Cummis | $ 226,447 |
| Deborah Sturman | $ 100,000 |

| Yorkson Legal | $ 889,918 |
|---|---|
| Nardello & Co. | $ 293,036 |
| Renaissance Associates | $ 443,571 |

(Ex. 18) [8]

These amounts do not include the payments to Kirkland for the post-verdict hearings, sentencing and appeal.

## ARGUMENT

**I.   THE DISCOVERY SOUGHT BY NG IS RELEVANT TO THE CLAIMS AND DEFENSES IN THIS ACTION**

**A.   The Federal Rules of Civil Procedure Provide for Broad Discovery**

Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26") provides for discovery

> regarding *any* nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

(Emphasis added); *see Beverly Hills Teddy Bear Co. v. Best Brands Consumer Products, Inc.*, 1:19-CV-3766-GHW, 2020 WL 7342724, at *3 (S.D.N.Y. Dec. 11, 2020) ("In federal actions, discovery should be broad, and all relevant materials which are reasonably calculated to lead to the discovery of admissible evidence should be [discoverable]. . . . information is relevant if it has any tendency to make a fact more or less probable and the fact is of consequence in

---

[8] This chart only includes payments to Shapiro through its invoice for May 2017. All or a discounted amount of Shapiro's invoices for June through August 2017, in the amount of $418,810, was paid after the Mo Firm was no longer responsible for disbursing payments. See Ex. 19); (Tr. 142:5-12).

10

determining the action.") (quotations and citations omitted); *see also S.E.C. v. Rajaratnam*, 622 F.3d 159, 180–81 (2d Cir. 2010) ("The Supreme Court has acknowledged the fundamental maxim of discovery that mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation.") (quotations and citations omitted).

Given the broad limits of discovery under the Federal Rules, the party resisting discovery must clear a high hurdle of demonstrating that the (i) the requested discovery is not relevant or (ii) "is of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure." *In re Pursuit Holdings (NY), LLC*, 18-12738 (MG), 2021 WL 163083, at *9 (Bankr. S.D.N.Y. Jan. 15, 2021); *accord Convermat Corp. v. St. Paul Fire and Marine Ins. Co.*, CV 06-1045 JFB AKT, 2007 WL 2743696, at *3 (E.D.N.Y. Sept. 18, 2007).

Consistent with these broad parameters, Fed. R. Civ. P. 30(a) ("Rule 30") provides that "[a] party may, by oral questions, depose any person, including a party, without leave of court." Indeed, a party is *only* required to seek leave of court to take a deposition under certain specified conditions—none of which are applicable here.[9]

While courts have broad discretion over discovery, "[a] court's power to limit discovery must be exercised against the backdrop of the broad discovery principles embodied in Rule 26(b)(1)." *Tri-Star Pictures, Inc. v. Unger*, 171 F.R.D. 94, 101–02 (S.D.N.Y. 1997 (permitting second deposition of witness, despite the lapse of seven years since the first deposition, given "Rule 26(b)(1)'s broad, mandatory prescription for the discovery of all relevant evidence"). Accordingly, a court is only required to limit discovery where:

---

[9] Those conditions include where the parties have not stipulated to the deposition and (i) the deposition would result in more than 10 depositions being taken by a party; (ii) the deponent has already been deposed; (iii) the party seeks to take the deposition prior to the time specified in Rule 26 (d); or (iv) the deponent is in prison. Fed. R. Civ. P. 30(a)(2)

11

> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;
> (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or
> (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1).

Fed. R. Civ. P. 26(b)(2)(C).

### B.    Ng will be Prejudiced if he is not Permitted to Take Discovery from His Former Attorneys

Additional depositions—beyond the single deposition of Mo—are warranted here. Ng should not be precluded from gathering evidence that can dispute the Mo Firm's self-interested and undocumented contentions. It is undisputed that the Mo Firm did not keep contemporaneous time sheets of the work it performed for Ng. It also is undisputed that the Mo Firm never represented Ng without at least one other firm—and sometimes two or three firms—representing Ng at the same time and for the same matter.

Although the Mo Firm concedes—as it must—that it was *not* the firm that argued at the multiple court hearings (from the bail hearing through sentencing), prepared and submitted the majority of the written correspondence and motion practice, located the expert witnesses or prepared the related expert witness notices or declarations, drafted the FSIA white paper, corresponded with the U.S. Attorney's Office, or was lead counsel at the trial, Mo claims an amorphous and undocumented role as the person "overseeing the factual narrative as well as the legal strategy, how to present the case." (Tr. 8:11-17; *see also*, 85:8-88:6 (claiming to be the "person who is acting as the principal attorney for Mr. Ng overseeing his legal team . . . overseeing all aspects of the case); 97:14-98:07 (claiming that PJB was engaged to be his "of counsel and to work under [him] directly in connection with this matter").)

The Mo Firm obviously cannot "oversee the factual narrative and legal strategy" without the knowledge of the legal team for whom he was allegedly providing this supervisory guidance. Thus, attorneys from these other firms are precisely the people who would know what role the Mo Firm played and the extent of that effort.

To explain the glaring absence of written documentation to support the Mo Firm's contention that it did work for which it has not been compensated, Mo claims that his work took place at multiple meetings and consultations as leader of the legal team. *See, e.g.*, (Tr. (105:04-12 (with respect to discovery searches: "we did it together . . . we had multiple meetings throughout the review of documents); 132:18-133:01 ("my firm is actively involved in meeting with . . . the entire legal teams on the Motion in Limine"); (189:24: "the entire legal team has multiple meetings regarding voir dire, graphic exhibits, areas to examine"); 200:13- 22 (we had "telephone calls" and "meetings" with Kirkland "because they . . . wanted to make sure they are accurate in their understanding of the trial record.").

Thus, by the Mo Firm's own admission, the legal team has first-hand knowledge with respect to at least some of the work the Mo Firm purports to have performed.

As established in Defendant's Response to the April 23, 2021 Order Regulating Proceedings, Mo bears the burden of establishing the work performed and reasonableness of the fees that he is seeking from his former client. *Jeffrey L. Rosenberg & Assocs., LLC v. Candid Litho Printing, Ltd.*, 76 A.D.3d 510 (2d Dep't 2010) ("In cases involving disputes between attorneys and clients over legal fees, as a matter of public policy, the attorneys have the burden of establishing that their compensation was fair and reasonable."). To date, the *sole* evidence presented that Mo did any of the actual billable work on behalf of Ng is his own deposition testimony. Otherwise, Mo has only produced boxes of case materials from the criminal case, but

13

nothing to show that *he* did any work with respect to those documents.  Given that (i) the Mo Firm has no contemporaneous, itemized timesheets or records detailing the amount of time and the legal work he performed for Ng; (ii) more than 90% of speaking roles at court appearances (including oral arguments and trial) were by attorneys other than Mo; and (iii) the motions and memoranda of law were prepared and filed by law firms other than the Mo Firm, it is crucial that Ng be permitted to depose other attorneys that worked on the case to counter Mo's self-serving deposition testimony and claims about the extent of his work.

Absent discovery from his other counsel, Ng also will be deprived of relevant evidence necessary to establish his claims that Mo and the Mo Firm fraudulently induced him to enter into the Agreement and Supplemental Agreement, and the Mo Firm breached its obligation to perform the legal work for which Ng agreed to pay the fixed fee the Mo Firm demanded.  Ng should be provided the opportunity to support his claims and defenses that the Mo Firm failed to perform its obligations under the Agreements and that fees sought are unreasonable because the overwhelming majority of the substantive legal work was done by other counsel.

The depositions are particularly necessary because the Mo Firm claimed in its Response to the Court's April 23 Order that it can somehow create "reconstructed time records" to support $6 million in attorney's fees.[10]  Ng should not be precluded from taking discovery from the law firms that actually did the work, who know and understand the scope of work required and the scope of the Mo Firm's participation the case.

Moreover, the depositions will not be "unreasonably cumulative or duplicative," as there has only been one deposition taken and there has been no discovery from any of Ng's other law firms concerning Mo's work (or lack thereof).

---

[10] To date, the Mo Firm has failed to produce any "reconstructed time records" notwithstanding Ng's demand for the production of time records.

Given the broad scope of discovery under Rules 26 and 30, and that only Mo's deposition has been taken, Ng should be permitted to take depositions of the other attorneys who represented him on the criminal matter. *See, e.g.*, *McCoy v. Energy XXI GOM, L.L.C.*, 695 Fed. Appx. 750, 759 (5th Cir. 2017) (reversing summary judgment and holding that the district court "abused its discretion in refusing to allow McCoy to conduct sufficient discovery in this case to support the allegations he has fairly raised," where the court only permitted the plaintiff to conduct a single deposition); *Miller v. Sam Houston State U.*, 986 F.3d 880, 891–92 (5th Cir. 2021) (reversing summary judgment and holding that the trial court abused its discretion by limiting plaintiff to a single two-hour deposition, noting that "the court's discovery restrictions suffocated any chance for Miller fairly to present her claims"); *cf. Pisani v. Westchester County Health Care Corp.*, 05 CIV.7113 (WCC), 2007 WL 107747, at *2 (S.D.N.Y. Jan. 16, 2007) (holding that, except in the special circumstance of depositions of high-level government officials, "courts are loath to preclude parties from deposing prospective witnesses).

But beyond the fact of the liberal discovery mandates of the Federal Rules, Mo lacks standing to challenge Defendant's proposed depositions. It is well-settled that "'[a] party lacks standing to challenge, on grounds of relevance or burden, a subpoena served on a non-party." *In re Rapid-Am. Corp.*, 13-10687 (SMB), 2018 WL 882398, at *2 (Bankr. S.D.N.Y. Feb. 12, 2018) (compiling cases); *US Bank Nat. Ass'n v. PHL Variable Ins. Co.*, 12 CIV. 6811 CM JCF, 2012 WL 5395249, at *2 (S.D.N.Y. Nov. 5, 2012) ("A party lacks standing to challenge, on grounds of relevance or burden, a subpoena served on a non-party."); *Doe v. Town of Greenwich*, 3:18CV01322(KAD), 2020 WL 2390979, at *3 (D. Conn. Jan. 10, 2020) ("In the absence of a claim of privilege a party usually does not have standing to object to a subpoena directed to a

non-party witness. Rather, only the person or entity to whom a subpoena is directed has standing to file a motion to quash.") (quotations and citations omitted).

Mo only has standing to quash a subpoena *ad testificandum* issued by Defendant if he could demonstrate that a right or privilege personal to *him* necessarily would be breached by permitting the deposition. *See, e.g.*, *Doe*, 2020 WL 2390979, at *3 ("If a party moves to quash a subpoena directed at a nonparty, the claim of privilege or right must be personal to the movant, not the nonparty the subpoena was served on."). The Mo Firm has no such right or privilege here.

## CONCLUSION

For the foregoing reasons, Ng's motion for leave to take third-party deposition should be granted.

Dated: May 21, 2021
      New York, New York

                        COHEN TAUBER SPIEVACK & WAGNER P.C.

                        By: /s/ Sari Kolatch
                            Stephen Wagner
                            Sari E. Kolatch
                            420 Lexington Ave., Suite 2400
                            New York, New York 10170
                            Tel.: (212) 381-8729
                            *Attorneys for Ng Lap Seng*