UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
THE LAW FIRM OF HUGH H. MO, P.C.,

                  Plaintiff,

            -against-                             Case No. 1:20-cv-07077 (AKH)

NG LAP SENG a/k/a DAVID NG,

                  Defendant.
-------------------------------------------------------------------X
NG LAP SENG a/k/a DAVID NG,

                  Third-Party Plaintiff,

            -against-

HUGH H. MO,

                  Third-Party Defendant,
-------------------------------------------------------------------X
NG LAP SENG a/k/a DAVID NG,

                  Counterclaim Plaintiff,

            -against-

HUGH H. MO,

                  Counterclaim Defendant.
-------------------------------------------------------------------X


## PLAINTIFF'S PRETRIAL MEMORANDUM OF LAW


The Law Firm of Hugh H. Mo, P.C.
225 Broadway, 27th Floor
New York, NY 10007
hhmo@hhmolaw.com
Tel. (212) 385-1500
Fax. (212) 385-1870

**<u>Table of Contents</u>**

PRELIMINARY STATEMENT ................................................................ 1

STATEMENT OF FACTS ..................................................................... 3

   I.   Ng Negotiated The Mo Firm's Engagement ........................................ 3

      1.   Initial Retainer ............................................................. 3

      2.   Supplemental Retainer Agreement ........................................ 4

      3.   All Attorney Roles at Ng's Discretion: Ng's Six Additional Terms and Conditions . 5

   II.   Ng's Control Over His Legal Defense Team ...................................... 5

   III.   The Mo Parties' Vital and Distinct Legal Services for Ng ......................... 6

      1.   Bail Hearing and Overseeing Bail Conditions ............................. 7

      2.   Ng's Directive to Assemble a Legal Team ................................. 7

      3.   Pre-Trial Phase ............................................................ 8

      4.   Sovereign Agent Immunity Defense Project ............................... 9

      5.   South-South News ......................................................... 9

      6.   Trial Phase ............................................................... 10

      7.   Post-Verdict .............................................................. 11

      8.   Additional Services by The Mo Firm as Required by Ng .................... 11

   IV.   Ng's Admissions Concerning His $1.9 Million Outstanding Balance ............... 12

   V.   Ng's Delay Tactics and Audit Ruse to Avoid Payment ........................... 12

   VI.   The Mo Firm's Full Compliance with Ng's Audit Ruse ........................... 15

   VII.   Ng's Continued Refusal to Pay Despite Acknowledging That $1.9 Million Was Due and Owing to The Mo Firm ...................................................... 15

ARGUMENT ............................................................................ 16

   I.   The Mo Firm Will Prove All of the Elements of Its Claims ....................... 16

      A.   *Breach of Contract:* Ng Materially Breached the Supplemental Retainer Agreement By Failing to Pay $1.9 Million Dollars16

      B.   An *Account Stated* Exists Against Ng for $1.9 Million Due to The Mo Firm ......... 19

   II.   Ng's Counterclaims and Defenses Fail as a Matter of Law ........................ 23

      A.   Ng Will Fail to Prove by Clear and Convincing Evidence That He was Fraudulently Induced by Mo To Sign the Retainer Agreements with The Mo Firm ................................ 23

         i.   **NG HAS PRIOR EXPERIENCE WITH SEEKING LEGAL FEES** ................... 25

         ii.   **NG ERRONEOUSLY RELIES UPON ALLEGED MISREPRESENTATIONS OF FUTURE INTENT** ................................................... 27

         iii.   **NG ERRONEOUSLY RELIES UPON APPARENT PUFFERY** ....................... 28

      B.   Ng's Breach of Contract Claim Fails as a Matter of Law ........................ 27

**i.    The Mo Firm Fully Performed On The Initial Retainer, Supplemental Retainer Agreement, And Additional Terms And Conditions ...................................................... 27**

**Ii.   Mo And The Mo Firm's Experience And Performance Will Prove The Reasonableness Of Its Fees ........................................................................................ 27**

**Iii.   Contemporaneous Time Records Are Not Required To Show Reasonableness Of Actual Services Provided In Plaintiff's Fixed Fee Claim ............................................ 31**

**CONCLUSION** .................................................................................................................. 33

Table of Authorities

**Cases**

*1 Toms Point Lane Corp. v. New York State Div. of Hum. Rts.,*
176 A.D.3d 930 (2019) ................................................................................ 35

*Albunio v. City of New York,*
23 N.Y.3d 65 (2014) .................................................................................... 16

*Alderman v. Pan Am World Airways,*
169 F.3d 99 (2d Cir. 1999).......................................................................... 30

*AT & T Corp. v. Publ'g Concepts L.P.,*
No. 08 Civ. 658(DC), 2010 WL 1191380 (S.D.N.Y. Mar. 29, 2010) ......... 17

*Broadcast Music, Inc. v. The Living Room Steak House, Inc.,*
No. 14 Civ. 6298,  2016 WL 756567 (E.D.N.Y. Feb. 26, 2016).................. 31

*C.M. v. Syosset Cent. Sch. Dist.,*
No. 11 Civ. 1402 (MKB), 2013 WL 6157188 (E.D.N.Y. Nov. 22, 2013) ... 31

*Camacho Mauro Mulholland LLP v. Ocean Risk Retention Grp, Inc.,*
No. 09 Civ. 9114, 2010 WL 2159200 (S.D.N.Y. May 26, 2010)......... 20, 22

*Carey v Mui-Hin Lau,*
140 F.Supp. 2d 291 (S.D.N.Y. Apr. 12, 2001) ...................................... *passim*

*Costopoulos v DeCoursey,*
151 A.D.3d 1452 (3d. Dept. 2017) .............................................................. 23

*Ellenoff Grossman & Schole, LLP v Rosenberg,*
No. 13 Civ. 7022, 2015 WL 1938138 (S.D.N.Y. Apr. 16, 2015)................ 16

*Exp. Dev. Can. v. Elec. Apparatus & Power, L.L.C.,*
No. 03 Civ. 2063, 2008 WL 4900557 (S.D.N.Y. Nov. 14, 2008) ............... 23

*Gabayzadeh v. Brafman,*
No. 09 Civ. 4095 PAC JCF, 2010 WL 6620688 (S.D.N.Y. June 18, 2010)......................... 25, 26

*George S. May Int'l Co. v. Thirsty Moose, Inc.,*
19 A.D.3d 721 (3d Dep't 2005)................................................................... 17

*Hubbard v. General Motors Corp.,*
No. 95 Civ. 4362, 1996 WL 274018 (S.D.N.Y. May 22, 1996).................. 26

*IMG Fragrance Brands, LLC v. Houbigant, Inc.,*

679 F. Supp. 2d 395 (S.D.N.Y. Dec. 18, 2009) ................................................................. 20

*In re CIT Bank, N.A.,*
*2017 U.S. Dist. LEXIS 29134* (E.D.N.Y. Feb. 28, 2017) ............................................... 35

*In re Karp*,
537 N.Y.S.2d 510 (1st Dep't. 1989) .............................................................................. 34

*Jacobson v Sassower*,
66 N.Y. 2d 991 (1985) ................................................................................................... 17

*Jones v. Barnes*,
463 U.S. 745 (1983) ....................................................................................................... 30

*Kimm v Kyu Sung Cho*,
706 Fed. Appx. 1 (2d Cir. 2017) ............................................................................. 16, 22

*Koral v. Koral*,
185 AD2d 298 (2d Dept 1992) ...................................................................................... 32

*Kramer, Levin, Nessen, Kamin & Frankel v Aronoff*,
638 F. Supp. 714 (S.D.N.Y. June 18, 1986) ........................................................... passim

*Leepson v. Allan Riley Co., Inc.,*
No. 04 Civ. 3720, 2006 WL 2135806 (S.D.N.Y. July 31, 2006) ................................. 23

*M. ex rel. P.M. v. Syosset Cent. Sch. Dist.,*
Civ. 11-1402 MKB GRB, 2013 WL 5799908 (E.D.N.Y. Oct. 25, 2013) ..................... 31

*Marion S.  Mishkin Law Office v. Lopalo*,
767 F.3d 144 (2d Cir. 2014) .......................................................................................... 34

*Michael B. Shulman & Assoc., P.C. v Canzona*,
201 A.D.3d 716 (2d. Dept. 2022) ................................................................................. 23

Moses & Singer, LLP v. S & S Machinery Corp.,
251 A.D.2d 271, 675 N.Y.S.2d 62 (N.Y.A.D.1998) ..................................................... 24

*National Econ. Research Assocs., Inc.*,
2011 U.S. Dist. LEXIS 24458 ....................................................................................... 22

*O'Connell & Aronowitz v. Gullo*,
229 A.D.2d 637, 644 N.Y.S.2d 870 (3d Dep't 1996) .................................................... 22

*People v. Cybulski*,
192 Misc. 2d 442 (Co. Ct. 2002). ................................................................................. 33

*Peterson v. Schroder Bank & Trust Co.*,
172 AD2d 165 (1991) ........................................................................................ 21

*Pichardo v. Koenig*,
112 N.Y.S.3d 424 (App. Term 1st Dep't 2018) .................................................. 32

*R.A. Associates v. Lerner*,
245 A.D.2d 437, 666 N.Y.S.2d 665 (2d Dep't 1997) ......................................... 21

*Riordan v. Nationwide Mut. Fire Ins. Co.*,
977 F.2d 47 (2d Cir. 1992) ................................................................................. 34

*Rodkinson v. Haecker*,
248 N.Y. 480 (1928) .......................................................................................... 20

*Rosenman Colin Freund Lewis & Cohen v. Neuman*,
93 A.D.2d 745, 746 (1983 ............................................................................ 21, 27

*S.D. v. St. Luke's Cornwall Hosp.*,
63 Misc. 3d 384 (Sup. Ct. Orange County 2019) ......................................... 32, 33

*Shaw v. Silver*,
95 A.D.3d 416 (1st Dept. 2012) ........................................................................ 21

*Shea & Gould v. Burr*,
194 A.D.2d 369, 598 N.Y.S.2d 261 (1st Dep't 1993) ........................................ 21

*Shranger v. Shranger*,
537 N.Y.S.2d 84 (3d Dep't. 1989). .................................................................... 34

*Sieratzki v. Sei Global, Inc.*,
No. 600183/09, 2009 WL 4009128 (N.Y. Sup. Ct. N.Y. County Nov. 10, 2009) ...................... 21

*Todtman, Nachamie, Spizz & Johns, P.C. v Ashraf*,
241 F.R.D. 451 (S.D.N.Y. Mar. 7, 2007) .......................................................... 23

*Wall v. CSX Transportation, Inc.*,
471 F.3d 410 (2d Cir. 2006) .............................................................................. 25

*Yiwu Lizhisha Accessories Co., Ltd. v Jjamz, Inc.*,
336 F. Supp. 3d 179, 183 (S.D.N.Y. Aug. 21, 2018) ......................................... 20

iii

Plaintiff The Law Firm of Hugh H. Mo, P.C. (the "Mo Firm") and Third-Party/Counterclaim Defendant Hugh H. Mo ("Mo") (collectively, the "Mo Parties") respectfully submit this pretrial memorandum in advance of trial scheduled before this Court. The Mo Parties will prove all the elements of its breach of contract and account stated claims. Defendant Ng Lap Seng's ("Ng") fraudulent inducement and breach of contract claims fail factually and as a matter of law. Accordingly, The Mo Parties's requests for relief should be granted in their entirety.

## PRELIMINARY STATEMENT

Ng, a sophisticated international businessman, self-made billionaire and convicted felon, acknowledged and yet refused to pay The Mo Firm $1.9 million in outstanding legal fees. Ng used his vast wealth to build a legal team as he saw fit. He also micromanaged and dictated every aspect of his criminal defense strategy and the roles of all the attorneys on his legal team. Simply put, he was the boss. The Mo Parties did what the boss told them to do: to zealously represent him as lead counsel.

The Mo Firm's direct evidence and factual testimony will prove its breach of contract and account stated claims in their entirety. Specifically, Ng materially breached the Supplemental Retainer Agreement with the Mo Firm, acknowledged an outstanding balance of $1.9 million, offered to pay and refused. Ng will not offer any credible evidence to refute the overwhelming direct evidence of his verbal and written agreement to the terms of the retainer agreements with the Mo Firm, the amount owed and his promise to pay.

Instead, Ng will fail to present credible evidence that he was fraudulently induced by Mo to sign the retainer agreements for The Mo Firm's engagement. Irrespective of his alleged naivete about the American criminal justice system and inability to speak English, Ng specifically

1

negotiated these agreements to his own satisfaction – handwriting his own fixed fee offer, terms and conditions and payment schedule.  He even reserved the right to decide what roles each attorney on his legal team would serve at his own discretion.  All of Ng's demands were met by The Mo Firm.

Ng now seeks to cast The Mo Parties' major role in his defense as minor and non-substantive all for his own benefit to avoid paying his $1.9 million legal fees.  But Ng himself dictated The Mo Parties' role among his army of more than two dozen lawyers and half a dozen law firms big and small. Ng also cannot refute the Mo Parties vital and distinct role as lead counsel in Ng's criminal matter in this District. Ng's claims that The Mo Parties played a minor and non-substantive role in his defense and outsourced all of the legal services it was retained to perform rings hollow when stacked against his own evidence.

Ng cannot credibly state that he complained about The Mo Parties' legal services but yet consistently relied on throughout the pendency of his case, in full performance and satisfaction of the Initial Retainer, Supplemental Retainer Agreement and the Additional Terms and Conditions. Nor can he support his allegations that the Supplemental Retainer Agreement fixed fee included payment to other attorneys when Ng himself paid other attorneys separately all under separate retainer agreements.  Moreover, the evidence will show that the only misrepresentations were made by Ng himself: that he was going to pay the Mo Firm's outstanding $1.9 million. Rather than abiding by his word, Ng orchestrated a scheme including reassigning the cash bail funds and ordering an audit all to avoid honoring his obligation to The Mo Firm.  The simple truth will be revealed at trial: Ng simply failed and refused to pay.

## STATEMENT OF FACTS

Ng engaged The Mo Firm to defend him as lead counsel on allegations that he was the mastermind of an international bribery scheme of foreign and United Nations officials in this District. *United States v. Ng. Lap Seng, et al.*, Case No. 15-cr-706 (VSB) (S5), United States District Court, S.D.N.Y. (the "Ng Case")

### I.    Ng Negotiated The Mo Firm's Engagement

### 1.    Initial Retainer

Ng signed The Mo Firm's Initial Retainer on October 8, 2015, after a post-arrest meeting with Hugh H. Mo ("Mo") agreeing to The Mo Firm's legal representation. Ng offered, agreed and paid $1 million: $500,000 payable at the outset of the engagement and $500,000 after his release from detention. Prior to signing, Ng hand wrote a note to his daughter in law stating that Mo would be lead counsel, ordering Mo to visit Ng daily and be fully familiarized with the government's allegations and Ng's Case prior to his detention hearing on October 16, 2015.  Afterward, Mo visited Ng on a daily basis for two to four hours, debriefed Ng and conducted extensive research and investigation into Ng's case until his release on October 26, 2015.

The Initial Retainer specifically provided that other lawyers would be separately retained by Ng at his own expense. At this point, Ng was already represented by nearly half a dozen attorneys and law firms, all separately retained. The Initial Retainer also provided that after Ng's release from detention, the parties would arrive at a separate fixed fee agreement for pre-trial proceedings and trial.

On October 26, 2015, the Court set Ng's bail at $50 million bail bond, secured by $20 million cash and real property, along with Ng and three additional co-signers on the bond. The Mo Firm obtained a bank check for the $20 million cash bail bond, drawn on The Mo Firm attorney

escrow account at Citibank, N.A., from previously wire-transferred funds by Ng ("Cash Bail Funds"). Ng was subsequently released to home detention at his Manhattan apartment, subject to GPS electronic monitoring, strict pre-trial supervision, 24-hour armed security monitoring, and other conditions. The Mo Firm oversaw Ng's compliance to the terms.

Ng fully satisfied the payment terms of the Initial Retainer, paying $1 million in two installments.  At no time did Ng make any verbal or written complaints to The Mo Parties that he was dissatisfied with The Mo Firm's performance of its obligations under this Initial Retainer. The Mo Parties fully complied with the terms of the Initial Retainer, and particularly Ng's handwritten additional terms.

### 2.  <u>Supplemental Retainer Agreement</u>

On October 31, 2015, Ng provided The Mo Firm with a handwritten proposed retainer payment schedule for additional legal services.  Ng proposed a fixed fee of $4 million: $2 million before trial ($1.5 million payable in installments and $500,000 from bail refunds) and then $2 million for trial ($1 million payable in two installments and $1 million from bail refunds).  The Mo Firm rejected Ng's proposed retainer payment and made a counter-proposal of a total $6 million fixed fee: $1,000,000 for bail and detention under the Initial Retainer; $2 million for pretrial services, $3 million for trial (with $1 million paid from bail refunds). Ng accepted The Mo Firm's counter proposal.  During these negotiations, Ng, like he indicated in his handwritten terms in the Initial Retainer, that he was going to retain additional legal counsel separately based on their expertise and ability to assist in Ng's defense.

On November 1, 2015, Ng signed a Supplemental Retainer Agreement ("Supplemental Agreement") with The Mo Firm for a $5 million fixed fee. The Supplemental Retainer incorporated the Initial Retainer by reference, provided legal services including: pre-trial services,

investigations, interviews of Ng and prospective witnesses, meetings with government prosecutors and co-counsel, all court appearances, discovery, motion practices, hearings, and trial. The $3 million trial fee was to be paid in three separate installments: $1 million 30 days before trial, $1 million 30 days from commencement of trial, and the final $1 million upon conclusion of trial. Ng made partial payments on the Supplemental Agreement. Ng paid $3.1 million of the total $5 million.

### 3.  <u>All Attorney Roles at Ng's Discretion: Ng's Six Additional Terms and Conditions</u>

On November 16, 2015, Ng hand wrote Six Additional Terms and Conditions ("Additional Terms and Conditions") that he insisted to incorporate with the Supplemental Agreement. Ng made no changes to the fixed fee but specified additional subject areas related to his defense that he deemed mandatory for The Mo Parties and then co-counsel Benjamin Brafman ("Brafman")[1] to master in preparation of his defense.

Notably, Ng's Additional Terms and Conditions specified that:

> "These terms and conditions must be met by both attorneys [Mo and Brafman], **and the Client [Ng] reserves the right at his discretion and judgment, as to which one of the attorneys to handle a particular phase or task throughout the defense of the case, including the role to be played by each attorney at the pre-trial and trial phases of the legal proceedings."** *Id.* (emphasis added)

## II.   **Ng's Control Over His Legal Defense Team**

As the client, Ng insisted that his legal team collaborate together, each bringing their own particular expertise.  Ng directed The Mo Parties to do just that and also attend to Ng's various

---

[1] Brafman represented Ng from September 29, 2015 to April 12, 2016, when he filed his notice of withdrawal. (Dkt 178).

other legal and ministerial matters. The Mo Firm remained as Ng's attorneys throughout the 33-month period of engagement and was never terminated.

Prior to Ng's engagement with The Mo Firm, Ng had already retained at least half a dozen other attorneys and law firms.  By 2016, Ng ordered all of those attorneys to cease work and they subsequently withdrew.  As a result of Ng's written command to cease work on his behalf, Ng was able to successfully dispute a subsequent demand by Orrick Herrington & Sutcliffe LLP ("Orrick") for payment owed, on the basis that Ng had ordered all attorneys to cease work. And, after engaging Kirkland & Ellis LLP, ("K&E") in February 2017, in awareness of their hourly billing fee arrangement, Ng ordered them to stop work and be on standby in April 2017 after they failed to negotiate a plea agreement for Ng without imprisonment. Ng also ordered Mo to negotiate a fixed fee retainer instead of the original hourly billing fee arrangement he had with Shapiro Arato, LLP ("Shapiro"). Repeatedly, Ng's conduct demonstrates a command of his legal team, particularly the fees.

## III.    The Mo Parties' Vital and Distinct Legal Services for Ng

The Mo Firm provided substantive legal services and logistical assistance to Ng for over 30 months, including but not limited to: preparing and meeting with Ng nearly every day for three to five hours in person, assembling a legal defense team of trial and appellate lawyers, along with international and UN legal experts, participating and overseeing all phases of the pre-trial investigation, discovery, motion practices, hearings, trial, post-verdict proceedings, pre-sentence investigation, sentencing, and appeals. Furthermore, The Mo Firm engaged and supervised two private investigative firms to conduct pre-trial investigations, engaged and supervised document reviewers of over 2.7 million documents. The Mo Firm also managed Ng's home confinement, with 27 bail terms and conditions, maintained and oversaw South-South News' continuing

operation and compliance with a grand jury investigation, developed Ng's sovereign agent immunity defense, met with Chinese government officials in the United States and in China, in an attempt to secure affirmative action on his behalf, and arranged Chinese consul visits. Due to Mo's reputable relations with the Chinese government, Mo was subject to two *Curcio* hearings during his representation of Ng and at each instance, Ng expressed adamantly his desire to keep Mo on his team.

Co-counsel in this case were not mandated to comply with the Additional Terms and Conditions. Importantly, as lead counsel it fell solely on The Mo Firm to comply with Ng's Additional Terms and Conditions and to educate co-counsel with an understanding and appreciation of the six subject areas and its importance to Ng's defense at Ng's insistence.

### 1.  Bail Hearing and Overseeing Bail Conditions

Ng attempts to marginalize Mo's role by implying that Brafman single-handedly drafted and submitted all the papers in connection with the detention/bail hearing, argued at the bail hearing, and drafted and submitted the appeal of the bail determination to the district court judge on appeal. However, the substantive content of the submissions was gathered by The Mo Firm through constant debriefing with Ng and detailed investigation and legal work to rebut the government's concern that Ng was a flight risk.  This substantive legal work by The Mo Firm is evident in emails, memos and other documents to be admitted at trial.

### 2.  Ng's Directive to Assemble a Legal Team

At Ng's directive, The Mo Firm assembled a legal team of attorneys and law firms that all worked towards one goal: Ng's Case defense.  Part of The Mo Firm's role as Ng insisted was to coordinate the roles of Ng's legal team members. This was in addition to The Mo Firm's own legal

services under the retainer agreements and Mo's expertise in the areas outlined in the Additional Terms and Conditions. Prior to Mo's engagement, Ng expressed a clear desire for a high-powered team of attorneys and engaged several separately and individually. Each legal team member was assigned a role as Ng saw fit, including Brafman who was only engaged for approximately six months and Tai Park ("Park") who was to be focused on the one month trial. The Mo Parties' role as lead counsel shifted as Ng saw fit. During Mo's engagement, Ng continued this behavior and freely signed additional retainers without Mo's input or even knowledge. During this time, Ng neither made any complaints to The Mo Parties about their legal services nor did Ng terminate The Mo Firm's retainer agreements.

### 3. **Pre-Trial Phase**

The Mo Firm led the legal team in extracting information from the mastermind charged: Ng. Mo met Ng every day to review and dissect the government's allegations and to reconstruct the history of Ng's involvement with South-South News, the UN Office of South-South Cooperation, South-South members states, the genesis of the Macau Conference Center, and all the involved parties, either in the United States or in China, including Ng's co-defendants and other critical witnesses. Furthermore, Mo educated and guided the other attorneys with an understanding of the unique Chinese cultural norms and institutions, as well as the proper formulation of the defense counternarrative throughout the pre-trial and trial phases.

The Mo Firm also actively participated in the document review of 2.7 million discovery documents provided by the government, including but not limited to, vetting and interviewing all Chinese document reviewers, further review and follow up of documents deemed pertinent, reviewing all Chinese documents and English translations, and electronic discovery. The Mo Firm was also involved with the UN production of documents, including the review of UN Office of

Audit Report, OIA hearing transcripts, and extensive interviews of the former director of the UN Office of South-South Cooperation.

### 4. **Sovereign Agent Immunity Defense Project**

As part of Ng's defense, The Mo Firm worked collaboratively with attorneys Deborah Sturman ("Sturman"), Abraham Sofaer ("Sofaer") and Arthur Miller ("Miller") in the preparation of three separate versions of white papers in 2015, 2016, and 2017 concerning a possible sovereign agent immunity defense to Ng's case. Ng was particularly invested in pursuing this avenue as a means of resolving his case through government channels without a trial.  Based on Mo's extensive experience representing the Chinese government and UN entities, his understanding of Chinese business and political institutions, and professional cultural norms, The Mo Firm was uniquely able to assist Ng's sovereign agent immunity defense. The Mo Firm was involved in editing the draft of the white paper prepared by Sturman, Sofaer, and Miller. Furthermore, The Mo Firm served as liaison in lobbying the Chinese government to take affirmative action on behalf of Ng with the U.S. Department of State to review the legality of Ng's prosecution under international law and to seek a dismissal of Ng's indictment. In connection with the sovereign agent immunity defense, Mo met with high-level UN officials in New York and Chinese officials in New York, Washington D.C., and Beijing, China. These efforts, all at Ng's direction, were separate and apart from the work done by The Mo Firm in overseeing and contributing to the work carried out by the third-party attorneys.

### 5. **South-South News**

At Ng's direction, The Mo Firm also engaged independent outside counsel to represent South-South News, which the government believed was an Ng-funded media platform for bribery

of UN officials and ambassadors, before a grand jury investigation, and assisted in the continuing operation and viability of South-South News, including but not limited to facilitating monthly funding from Ng, assist in management and operations, review pertinent documents of South-South News activities from inception, investigate the history and background of South-South News, including the roles played by other co-defendants and individuals who were involved in the founding and operation of South-South News. This was in accordance with the retainer agreements and the Additional Terms and Conditions.

6. **Trial Phase**

Ng's trial commenced on June 26, 2017, and resulted in a guilty verdict on July 27, 2017. As consistent with the Additional Terms and Conditions, Ng determined the roles of his legal team members, including who was to have a speaking role in court. At Ng's urging, Mo sat next to Ng during the entire trial. Mo advised Ng in real time of trial developments and legal issues while Ng provided Mo handwritten notes. Mo relayed Ng's notes to co-counsel, weighed in on trial strategy and further communicated Ng's comments and requests to the trial team. Mo's participation during the trial was integral because of his experience in federal criminal proceedings and his ability to communicate with Ng directly. Mo attended all sidebar conferences before the court, regularly provided comments and suggestions regarding trial strategies, drafted two versions of the opening statements, prepared memos on trial strategy, critiques on prospective witnesses, critique on all trial exhibits, participated in *voir dire* examinations, examined two government witnesses on cross, assisted on the details of Ng's counter narrative and nuances of the facts, assisted on the formulation of legal arguments, investigate with overseas contacts on any new issues in the midst of trial, reviewed and commented on all legal submissions and contributed to the jury addresses.

Ng was also provided Chinese interpreters 24-hours a day and also engaged two other attorneys who attended the trial and met with Ng everyday who spoke Chinese as their native language: Sue Huang and Cheng Liu. Not once did Ng express any dissatisfaction with The Mo Parties' services during trial and went on to request further service from Mo personally in the post-verdict phase.

**7.  Post-Verdict**

Following Ng's conviction, Ng engaged Kirkland & Ellis ("K&E") to handle post-verdict proceedings, while The Mo Firm and other attorneys and firms assisted in familiarizing K&E with Ng's case from inception to trial.  This included assisting K&E with all post-verdict proceedings including comments on the trial record, bail pending appeal, motion to set aside the verdict, sentencing investigation, reviewing the pre-sentencing memorandum, Ng's Second Circuit appeal, and request for an *en banc* proceeding.

During this time, Ng still sought to pursue his sovereign agent immunity defense and required The Mo Parties' legal assistance.  As such, Ng ordered Mo to go to Shanghai, China to secure a declaration from Zhou Yiping for the pre-sentencing memo, arranged Chinese consul visits for Ng at his apartment and met with Chinese officials on behalf of Ng.

**8.  Additional Services by The Mo Firm as Required by Ng**

Pursuant to Ng's strict bail conditions, Ng also required The Mo Parties' assistance with his health and medical needs, scheduling appointments and necessary medical procedures throughout the engagement. Not only did The Mo Firm assist with arranging Ng's family members' visits from Asia with Pretrial Services at Ng's insistence, The Mo Firm also obtained Pretrial Services approval to hire Ng's requisite housekeeper/cook and masseuse while in home confinement, along with handling the respective payroll and tax filings.

At Ng's direction, The Mo Firm also assisted Ng with the periodic extensions of his various loans and credit lines with overseas financial institutions and his related business matters. The Mo Firm also singlehandedly oversaw over $12 million in accounting and disbursements to ensure proper and timely payments for Guidepost Security monitoring services, the entire legal defense team, private investigation, litigation support vendors, discovery, and other service providers involved in Ng's Case defense.  Throughout the pendency of Ng's case, after conviction and even after failed appeal attempts, Ng never made any complaints about The Mo Firm legal services under the retainer agreements.

### IV.      Ng's Admissions Concerning His $1.9 Million Outstanding Balance

The Mo Firm sent two invoices to Ng for the outstanding $1.9 million balance: on July 31, 2017 and on August 16, 2017. ("Outstanding Invoices") The $1.9 million was for the remaining balance of the second and third installments of the trial fee pursuant to the Supplemental Agreement.  Ng and his daughter Feilan acknowledged receipt, confirmed that the amount owed was correct and made no objection or complaint to the two invoices. Ng and Feilan acknowledged the amount in the Supplemental Agreement was due and owing to The Mo Firm without objection verbally and by email, expressly stating to Mo, "I guarantee you will get paid."

### V.      Ng's Delay Tactics and Audit Ruse to Avoid Payment

On August 14, 2017, pursuant to Ng's request, Mo provided copies of all engagement letters, agreements, and schedules of payments to date from The Mo Firm's attorney escrow account to Ng and with a copy to Feilan.  On November 1, 2017, Mo met with Ng regarding his pending sentencing proceedings and other matters, including the Outstanding Invoices, and Ng

confirmed that he would honor the Outstanding Invoices and promised that the entire amount of $1.9 million would be paid from his Cash Bail Funds. He did not.

Pursuant to Mo's request, K&E provided Mo with a copy of the Supplemental Letter for Retention to Provide Legal Services, dated August 15, 2017, ("K&E Bail Assignment"). Also pursuant to Mo's request, on November 18, 2017, Viet Dinh ("Dinh"), a K&E partner, confirmed by email, Ng's instructions that upon its release to K&E, the Outstanding Invoices would be paid from the Cash Bail Funds. Dinh also requested copies of the Outstanding Invoices for $1.9 million and Mo complied on November 22, 2017 and again on May 15, 2018.

On July 3, 2018, George N. Bauer ("Bauer"), then a K&E partner, wrote to Mo requesting that he co-sign an authorization for the release of the Cash Bail Funds to K&E since The Mo Firm was listed on the court receipt as having paid the Cash Bail Funds on Ng's behalf.  On July 5, 2018, Mo agreed to authorize the release of the Cash Bail Funds conditioned upon written confirmation from K&E that within 5 days of receipt of the Cash Bail Funds, K&E would wire transfer the amount of $1.9 million to The Mo Firm in full payment of the Outstanding Invoices.

On July 5, 2018 Ng entered into a Payment Agent Agreement ("PAA") with K&E, that restricted the Cash Bail Funds to only pay K&E's legal fees and costs and all other payments required Ng's written authorization. Two days later on July 7, 2018, Bauer sent a Letter Authorization signed by Ng for the release of the Cash Bail Funds, which required Mo's counter signature, along with the PAA. In response, Mo expressed concern to Bauer that the PAA contracted Ng's prior consent to pay The Mo Firm's legal fees from the Cash Bail Funds. Mo then provided Dinh copies of the Initial Retainer, Supplemental Agreement, and Outstanding Invoices and prior emails and letters in 2017 and 2018 in which Dinh confirmed Ng's instructions that the Outstanding Invoices would be paid from the Cash Bail Funds, if and when, it was released to

K&E. Mo requested that Dinh revise or supplement the PAA to explicitly provide that the Outstanding Invoices would be paid from the Cash Bail Funds, pursuant to Ng's prior authorizations. On July 9, 2018, Mo emailed Dinh and reiterated his request that the PAA be revised. Mo further mentioned that Dinh had an obligation to advise Ng at the time he and K&E entered into the PAA that The Mo Firm's invoices would be paid. On July 19, 2018, Feilan emailed Mo requesting an accounting of all disbursements from The Mo Firm attorney escrow account, which included the $20 million Cash Bail Funds.  Feilan explained that upon review of the accounting documents, Ng would quickly process payment of the Outstanding Invoices.

On July 20, 2018, pursuant to Feilan's request, Mo emailed and hand delivered to Feilan, a summary of all wire transfers and credits and disbursements from The Mo Firm's attorney escrow account to pay the expenses in connection with Ng's defense in expectation of Ng's quick payment of the Outstanding Invoices.  Feilan then advised on August 1, 2018 that Ng requested receipts supporting the disbursements and the purposes for the payments from The Mo Firm.  Feilan reassured Mo that Ng would instruct K&E to wire the $1.9 million to The Mo Firm as soon as the Cash Bail Funds were released.  The next day, Bauer emailed Mo and reiterated that, pursuant to Ng's and Feilan's authorization, K&E would immediately wire $1.9 million to The Mo Firm upon its receipt of the Cash Bail Funds which required Mo's authorization.  In full reliance of K&E's representation, Mo then signed the Letter of Authorization for the release of the Cash Bail Funds to K&E on August 2, 2018 to The Mo Firm's detriment.

On September 11, 2018, pursuant to a Court Order issued by Judge Vernon S. Broderick of U.S. District Court, SDNY the Court released the Cash Bail Funds, minus $2,803,577.20 (fines, forfeiture, restitution, and court surcharge), in the amount of $17,196,422.80 to K&E pursuant to a Court Order.  On September 25, 2018, Bauer called Mo confirming that although K&E received

the Cash Bail Funds, but Ng advised that he countermanded his prior authorizations and instructions to K&E to wire transfer $1.9 million to The Mo Firm as payment of the Outstanding Invoices.

### VI.     The Mo Firm's Full Compliance with Ng's Audit Ruse

On September 25, 2018, Mo received an email from Feilan, along with a hand-written letter in Chinese purportedly signed by Ng on September 2, 2018, and with Feilan's English translation, as follows:

> Regarding the issue of Attorney Mo's legal fee, the payment must be made according to the terms of the contract. It shall be made only after an audit is performed. I do not want to, and I will not owe anyone any money. But I want all fees charged to be reasonable and paid only in accordance with the terms we agreed to at the time. Payment shall be made only upon my approval. Thank you for your understanding and cooperation. NG LAP SENG September 2, 2018.

The Mo Firm then willingly obliged to an audit demanded by Ng of over $12 million disbursed from The Mo Firm attorney escrow account by Ng's outside accounting firm, J.T. Shulman as a condition of payment of his arrears.  This audit was fully substantiated. At no point did Ng or his agent request an accounting of The Mo Parties' legal services under their engagement nor any dissatisfaction with services performed up to that point.

### VII.    Ng's Continued Refusal to Pay Despite Acknowledging That $1.9 Million Was Due and Owing to The Mo Firm

While the audit was substantially completed in April 2019, J.T. Shulman advised Mo that it could not produce a final report until instructed to do so by Sue Huang. Ng and his agent Feilan refused to further instruct J.T. Shulman proceeded in closing the audit despite demands by The Mo Firm. Both Mo and J.T. Shulman made repeated requests to Ng's agent, Sue Huang, for

instructions to proceed with completing the audit. Both were met with silence until the filing of this action. Despite The Mo Parties full performance on the retainer agreements, Ng has failed to pay the outstanding $1.9 million balance.

**ARGUMENT**

### I.    The Mo Firm Will Prove All of the Elements of Its Claims

### A.  *Breach of Contract:* Ng Materially Breached the Supplemental Retainer Agreement By Failing to Pay $1.9 Million Dollars Ng's Counterclaims and Defenses Fail as a Matter of Law

The Mo Firm will prove every element of their breach of contract claim against Ng. First, it is undisputed that the parties had a valid, existing, and enforceable contractual relationship: Supplemental Retainer Agreement ("Supplemental Agreement").  Second, irrespective of Ng's characterization of The Mo Firm's role on Ng's legal team, the evidence overwhelming demonstrates performance under the retainer agreements, particularly the Supplemental Agreement. Third, Ng admitted that he had an unpaid balance of $1.9 million and agreed to pay it -- a material breach of its terms.  Fourth, the Mo Firm suffered damages as a result of Ng's material breach of the Supplemental Agreement.  Lastly, the Supplemental Agreement was fair, reasonable and fully understood by Ng as he negotiated it himself with The Mo Firm and he accepted all of its terms. *Kimm v Kyu Sung Cho*, 706 Fed. Appx. 1 (2d Cir. 2017); *Ellenoff Grossman & Schole, LLP v Rosenberg*, 13-CV-7022, 2015 WL 1938138 (S.D.N.Y. Apr. 16, 2015); *Albunio v. City of New York*, 23 N.Y.3d 65 (2014); *AT & T Corp. v. Publ'g Concepts L.P.,* No. 08-CV-7658(DC), 2010 WL 1191380 (S.D.N.Y. Mar. 29, 2010); *Carey v Mui-Hin Lau*, 140 F.Supp. 2d 291, 296 (S.D.N.Y. Apr. 12, 2001); *Kramer, Levin, Nessen, Kamin & Frankel v Aronoff,* 638 F. Supp. 714, 720 (S.D.N.Y. June 18, 1986); *George S. May Int'l Co. v. Thirsty Moose, Inc.,* 19 A.D.3d 721 (3d Dep't 2005); *Jacobson v Sassower*, 66 N.Y. 2d 991, 993 (1985).

Ng contends that he was fraudulently induced into signing the Supplemental Agreement and therefore is not in breach of its terms. None could be further from the truth. The evidence will demonstrate that Ng's background and experience as a sophisticated businessman and self-made billionaire who was involved with each retainer agreement with his legal team.

Curiously, Ng's defense is parallel to a fee dispute in this District that also involved sophisticated businesspeople who were held liable for breach of contract and account stated against their attorney for unpaid legal fees. In *Carey*, 140 F.Supp. 2d at 296 (2001), attorney-plaintiff Carey ("Attorney Carey") sought to recover unpaid legal fees from his former clients-defendants ("Lau clients") under breach of contract, *quantum meruit* and account stated. *Id.* The Lau clients sought to invalidate the breached retainer agreement because Attorney Carey misrepresented key terms of the retainer's contents and that some were unable to communicate directly to him in English. *Id.* The Court rejected the Lau clients' allegations, noting that they were sophisticated businesspeople and that,

> [t]he . . . facts do not demonstrate a case of fraud, deceit, overreaching, or undue influence [by Attorney Carey]. Nor do these facts demonstrate a lack of communication between plaintiff and defendants such that defendants would have been unaware of the status or the consequences of plaintiff's legal representation.

*Id.* The Court also noted that Attorney Carey adequately kept the Lau clients informed, giving them case updates, sending them copies of correspondence, legal documents and invoices to all of the Lau defendants. *Id.* The Lau clients paid some of the fees owed to Attorney Carey and only complained after they claimed that they were unable to pay. *Id.*

Similarly, there is no fraud, deceit, overreaching or undue influence by The Mo Parties against Ng here. Ng's direct involvement to negotiate the retainer agreements is evident from the start. Ng handwrote two additional terms to the Initial Retainer insisting that Mo visit Ng daily

17

while in pre-trial detention and be fully familiarized with the case prior to the detention hearing. By this point in October 2015, Ng had already engaged half a dozen American attorneys and law firms representing him who he had already paid hundreds of thousands of dollars, some who spoke Chinese fluently and could have advised him of all the retainer agreements with The Mo Firm prior to signing and joining Ng's legal team.  Then and now, Ng routinely deals with business dealings involving lawyers, contracts and government officials in Macau, Hong Kong, China and the United States. Ng also had his daughter Feilan, who is fluent in English and Chinese, involved in his dealings with The Mo Parties regarding the engagement. After Ng's release, he proposed a fixed fee with The Mo Firm for the Supplemental Agreement. The Mo Firm proposed a counteroffer which Ng accepted.  Only after that did Ng sign the Supplemental Agreement.  Two weeks later, Ng hand wrote his Additional Terms and Conditions to be incorporated into the Supplemental Agreement and specifically stated that Ng reserved the right to decide which attorney took on what role on his legal team. During this time, Ng also discharged five of the attorneys he previously engaged and their law firms that he initially engaged and thwarted an attorneys' fees dispute with Orrick.  Ng and his daughter Feilan reviewed all of the legal team's bills, and particularly The Mo Firm, which was tasked with handling all attorney disbursements that totaled $12 million.

From October 2016 to August 2017, Ng and Mo met every day. Ng first required a case status update and update on other legal issues tasked to the Mo Firm. Ng also met other Chinese speaking attorneys frequently and everyday prior to and during trial including Sue Huang and Cheng Liu, who gave him constant status updates as well. Ng also had a Chinese translator by his side at all times who he could have asked to communicate with if he had any questions or issues. All decisions on investigations, witness interviews or legal defense theories were discussed with

Ng to obtain input and approval. Throughout the pendency of the Ng's Case, he was in complete control of his legal defense and other options through political channels to resolve his case short of trial that required The Mo Firm's legal assistance.

The facts in this case far outweigh those in *Carey* to demonstrate that Ng was not fraudulently induced to sign the Supplemental Agreement or any of the retainer agreements with The Mo Firm. They were all fair, reasonable and fully understood by Ng and he accepted all of its terms on his own terms. Accordingly, Ng materially breached the Supplemental Agreement by refusing to pay the outstanding $1.9 million balance.

### B.  <u>An Account Stated Exists Against Ng for $1.9 Million Due to The Mo Firm</u>

It is a well settled legal principle that an account stated may be established between an attorney and his client. *Kramer, Levin, Nessen, Kamin & Frankel*, 638 F Supp at 719 (1986) *quoting Rodkinson v. Haecker,* 248 N.Y. 480 (1928)(account stated existed against client to recover outstanding attorney's fees). In New York, to prevail on an account stated claim, a plaintiff must show that: "(1) an account was presented; (2) it was accepted as correct; and (3) [the] debtor promised to pay the amount stated." *Camacho Mauro Mulholland LLP v. Ocean Risk Retention Grp, Inc.,* No. 09 Civ. 9114, 2010 WL 2159200, at *2 (S.D.N.Y. May 26, 2010) *quoting IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 679 F. Supp. 2d 395, 411 (S.D.N.Y. Dec. 18, 2009). In addition, "[t]he second and third requirements . . . may be implied if 'a party receiving a statement of account keeps it without objecting to it within a reasonable time or if the debtor makes partial payment.'" *IMG Fragrance Brands,* 679 F.Supp.2d at 411 (*quoting LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham,* 185 F.3d 61, 64 (2d Cir. 1999)); *Yiwu Lizhisha Accessories Co., Ltd. v Jjamz, Inc.,* 336 F. Supp. 3d 179, 183 (S.D.N.Y. Aug. 21, 2018), *report and recommendation*

*adopted,* 16-CV-6418 (JPO), 2019 WL 2763841 (S.D.N.Y. July 2, 2019). Specifically, a client's failure to object or dispute the account's correctness, "will be deemed by his silence to have acquiesced, and will be bound by it as an account stated unless fraud, mistake or other equitable considerations are shown." If he omits to do so, he will be deemed by his silence to have acquiesced, and will be bound by it as an account stated, unless fraud, mistake or other equitable considerations are shown" *Peterson v. Schroder Bank & Trust Co.*, 172 AD2d 165, 166 (1991) (internal quotation marks omitted); *see also Rosenman Colin Freund Lewis & Cohen v. Neuman*, 93 A.D.2d 745, 746 (1983)); *Shaw v. Silver*, 95 A.D.3d 416 (1st Dept. 2012)(finding attorney's bills to client were sufficient to create account stated and the reasonableness of the bills were not required to be established).  It is well-settled that a debtor's failure to object to invoices for a period of five months is unreasonable. *R.A. Associates v. Lerner*, 245 A.D.2d 437, 666 N.Y.S.2d 665, 666 (2d Dep't 1997); *see also Shea & Gould v. Burr*, 194 A.D.2d 369, 371, 598 N.Y.S.2d 261 (1st Dep't 1993) ("The failure to object to the un-itemized bill for a period of five months suffices to give rise to an account stated, especially in view of the partial payment made."); *Sieratzki v. Sei Global, Inc.*, No. 600183/09, 2009 WL 4009128 (N.Y. Sup. Ct. N.Y. County Nov. 10, 2009) (holding that the defendant client's delay of five months in objecting to plaintiff's invoices was unreasonable). Finally, "[a]s to timing, '[a]n objection made for the first time upon commencement of proceedings will not suffice.'" *National Econ. Research Assocs., Inc.*, 2011 U.S. Dist. LEXIS 24458, at *6 (citation omitted); *see also O'Connell & Aronowitz v. Gullo*, 229 A.D.2d 637, 644 N.Y.S.2d 870, 871-872 (3d Dep't 1996) (affirming Supreme Court's judgment, issued after a non-jury trial, in favor of the plaintiff, an attorney, for an account stated; holding that, because the defendant client did not object to the plaintiff's statement of account until the plaintiff sued to recover legal fees, the client's objection was insufficient).

Here, the evidence presented will unequivocally show that: (1) the Mo Firm presented an account for $1.9 million to Ng; (2) Ng accepted as correct and made no objections within a reasonable amount of time, and (3) Ng promised to pay the amount stated. *Camacho Mauro Mulholland LLP* at 2010 WL 2159200 (2010).  The Outstanding Invoices were presented to Ng and Feilan who acknowledged receipt, accepted them and agreed to its amount.  Ng made no complaints about The Mo Firm's legal services after Ng received the Outstanding Invoices. Nor did Ng object within five months after receiving the Outstanding Invoices or any reasonable amount of time.  *Kramer, Levin, Nessen, Kamin*, 638 F Supp at 719 (1986); *Kimm*, 706 Fed. Appx. at 4 (2017); *Carey*, 140 F. Supp. 2d at 296 (2001); *Todtman, Nachamie, Spizz & Johns, P.C. v Ashraf*, 241 F.R.D. 451, 455 (S.D.N.Y. Mar. 7, 2007), *affd.* 316 Fed. Appx. 51 (2d Cir. 2009); *Exp. Dev. Can. v. Elec. Apparatus & Power,* L.L.C., No. 03 CV 2063, 2008 WL 4900557, at *16 (S.D.N.Y. Nov. 14, 2008)*Leepson v. Allan Riley Co., Inc.,* No. 04 CV 3720, 2006 WL 2135806, at *4 (S.D.N.Y. July 31, 2006);  *Costopoulos v DeCoursey,* 151 A.D.3d 1452 (3d. Dept. 2017); *Michael B. Shulman & Assoc., P.C. v Canzona,* 201 A.D.3d 716 (2d. Dept. 2022). Ng's complaint after filing this suit also does not suffice as a proper objection. *Kramer, Levin, Nessen, Kamin & Frankel* at 721. (noting that belated objections are insufficient without fraud, mistake, or other equitable considerations.)

Instead, Ng repeatedly confirmed that he would honor and pay the Outstanding Invoices. Prior to trial, Feilan emailed Mo claiming that payment delays were due to Ng's cashflow issues. Feilan also stated that Ng would make partial payments and urged Mo not to involve the Court to access the Cash Bail Funds. However, expressing an inability to pay is also not a legally sufficient objection to the account stated, and rather, demonstrates an acknowledgement of the defendant's obligation to pay and the correctness of the account. *Carey*, 140 F Supp 2d at 298 ("Although

defendants expressed an inability to pay in February 1990, that is not a legally sufficient objection to the account."); see also *Moses & Singer, LLP v. S & S Machinery Corp.,* 251 A.D.2d 271, 675 N.Y.S.2d 62 (N.Y.A.D.1998) (acknowledgment of inability to pay equals admission of liability as to the amount).

After trial, Feilan continued to acknowledge the amount owed and would expressly promise "I guarantee you will get paid." Even after Ng signed the PAA, he and Feilan repeatedly promised to pay and urged Mo to sign the letter of authorization, all to The Mo Firm's detriment. This is documented in several emails with Feilan and K&E that The Mo Firm's outstanding balance owed from the Cash Bail Fund. However, Ng's false promise would fail to suffice upon the actual release of the Cash Bail Fund. After securing the release of the Cash Bail Fund with Mo's written authorization, The Mo Firm further complied with Ng's handwritten note with explicit instructions about the outstanding $1.9 million balance: "the payment must be made according to the terms of the contract. It shall be made only after an audit is performed. I do not want to, and I will not owe anyone any money. But I want all fees charged to be reasonable and paid only in accordance ith the terms we agreed to at the time. Payment shall be made only upon my approval." The Mo Firm willingly agreed to the audit that Ng required after admitting and agreeing to pay the outstanding balance. Ng refused to close the audit after it was properly substantiated.

Accordingly, the Mo Firm will prove every element of the account stated claim against Ng in the amount of $1.9 million.

II.     **Ng's Counterclaims and Defenses Fail as a Matter of Law**

A.     <u>**Ng Will Fail to Prove by Clear and Convincing Evidence That He was Fraudulently Induced to Sign the Initial Retainer and Supplemental Agreement by Mo and the Mo Firm**</u>

Ng contends that he was fraudulently induced by Mo's representations about his background, experience and ability to handle Ng's Case and that Mo outsourced all of the legal work to other attorneys.  The evidence will show otherwise.

In order to prove fraud under New York law, Ng must show by clear and convincing evidence that The Mo Parties: (1) made a material false representation [or omission]; (2) with intent to defraud Ng; (3) Ng reasonably relied upon the representation; and (4) Ng thereby suffered as a result of such reliance. *Wall v. CSX Transportation, Inc.,* 471 F.3d 410, 415–16 (2d Cir. 2006) (Defendant-client was fraudulently induced into an attorney retainer agreement when "(1) the defendant made a material false representation [or omission], (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance."); *see also*, *Gabayzadeh v. Brafman*, 09 CIV. 4095 PAC JCF, 2010 WL 6620688, at *4 (S.D.N.Y. June 18, 2010), *report and recommendation adopted,* 09 CIV. 4095 PAC JCF, 2011 WL 1842762 (SDNY May 11, 2011), *affd,* 502 Fed Appx 83 (2d Cir 2012).

Ng wants this Court to believe that, as a convicted mastermind of a complex UN bribery scheme in this District, a man whose bail was set at $50 million bail bond, secured by $20 million cash and real property, he was "duped" by Mo to sign the retainer agreements.  Ng contends that he will present evidence that he was, "(1) not informed about the Mo Firm's minimal role in representing him i[n] the criminal action and (2) had complained to the Mo Firm both about the

costs of the litigation and about the investigation and discovery strategy pursued that unnecessarily increased costs." (Dkt. No. 34 Pg. 9 fn. 3). No such omissions were made by Mo.

While Mo made no misrepresentations to Ng, any representations regarding Mo's legal experience do not amount to fraudulent inducement but are deemed opinion or puffery. *Gabayzadeh v. Brafman*, 09 CIV. 4095 PAC JCF, 2010 WL 6620688, at *7 (S.D.N.Y. June 18, 2010), *report and recommendation adopted*, 09 CIV. 4095 PAC JCF, 2011 WL 1842762 (S.D.N.Y. May 11, 2011), *affd*, 502 Fed Appx 83 (2d Cir 2012).

In *Gabayzadeh*, Brafman's client alleged that he made fraudulent statements about his legal experience that induced the client to sign the retainer agreement. The Court found Brafman's statements about his experience in the retainer agreement and about white-collar criminal defense to be "a clear instance of 'puffery'—a 'generalized or exaggerated statement[ ] such that a reasonable consumer would not interpret the statement as a factual claim upon which he or she could rely.'" *Id.* (citing *Hubbard v. General Motors Corp.*, No. 95 Civ. 4362, 1996 WL 274018, at *6 (S.D.N.Y. May 22, 1996)). The Court further opined that, "[s]tatements that are merely puffery [are opinion not fact and] cannot form the basis of a claim of fraud." *Id.* The same exists here with Mo and his statements of his experience in white collar criminal defense and decades working with Chinese clients to Ng.

In addition, the evidence demonstrates that Ng fashioned The Mo Parties' role on his legal team to his own liking, and used Mo's experience accordingly.  Ng specifically tasked The Mo Firm to resolve the case without trial through government channels, engaging with Chinese officials on Ng's behalf.  Ng now only focuses on the trial and the lawyers inside the well during his trial to minimize The Mo Parties' role.  However, none of these lawyers were engaged by Ng

for the entire pendency of his matter and were only involved in one stage, either pre-detention or trial. Ng's Case was not merely the trial that required a trial team. Ng's Case required an international legal team, some of whom handled the trial, led by The Mo Firm.

The Mo Parties's vital and distinct role on Ng's legal team that was demanded and micromanaged by Ng. And, while Ng can now say that he complained about litigation costs, not once did he complaint about the monies owed on the retainer agreements the each and every day he met with Mo in person. Only until the filling of this action did he state his specific objection to the $1.9 million owed to further delay and deny responsibility. Ng cannot establish reasonable reliance on this sudden allegation of fraud when he had more than ample opportunity to inquire about The Mo Parties' bills.

### i. Ng Has Prior Experience With Seeking Legal Fees

Ng has prior experience with seeking legal fees and is capable of negotiating fees, evaluating competent legal counsel, and quite frankly, raising complaints. "[B]elated objections" to an account stated are "insufficient to raise genuine factual issues warranting denial of summary judgment" unless fraud, mistake, or other equitable considerations are shown." *Kramer, Levin, Nessen, Kamin & Frankel,* 638 F. Supp. at 722 (1986) (*citing Rosenman Colin Freund Lewis & Cohen v. Neuman, supra,* 93 A.D.2d at 746, 461 N.Y.S.2d at 299).

In *Kramer*, the client with outstanding unpaid legal fees was a businessman "who dealt with several high powered law firms in various lawsuits" and was "presumed to be aware of the prevailing rates of the law firms he engaged." *Kramer* at 721. Ng is no different: with a legal team of attorneys and law firms big and small, he was fully aware of the prevailing rates of the law firms he engaged. Even prior to negotiating the Initial Retainer, he signed the retainer with Brafman,

who operates a small criminal defense firm and sought millions and was paid for it for merely six months of legal work.

If anything, the evidence unequivocally will show that Ng knew what he wanted to pay for and he was an astute administrator of his legal team. Not only did he continue to manage critical issues related to his businesses with The Mo Firm's assistance, Ng kept a sharp eye on his legal team and commanded changes where he saw fit, without The Mo Parties' assistance. This was most telling when Ng discharged his first set of attorneys and law firms hired prior to Mo and Brafman, retained K&E and Sue Huang, all without The Mo Parties' input.  Ng also unilaterally re-assigned speaking roles for the trial. And while Ng re-assigned the opening statement from Mo to Park, Ng continued to rely on The Mo Parties' as lead counsel throughout the trial.

Also like Ng, the client in *Kramer* demonstrated acceptance of the charges in his failure to raise a single inquiry as to the fair and reasonable value of the attorneys' services despite ample opportunity to do so. *Id.* Throughout the month-long trial, Ng did not make any written or verbal complaint to The Mo Parties. Ng has always had access to agents capable of acting on his behalf fluent in Chinese and English: relatives as his agents, his daughter Feilan, his daughter-in-law Crystal and her assistant Jason Meng and and attorneys before and during the Mo Firm's engagement.

Instead, Ng's actions speak louder than his belated words. Ng made payments in full satisfaction of the pre-trial phase and made partial payments for the trial phase well into the start of trial itself. Despite numerous opportunities to dispute the outstanding balance due, Ng did not make a single suggestion that there was anything wrong with The Mo Parties' legal services or the bills submitted. Instead, he continued to affirm his obligation to pay The Mo Parties' outstanding balance due while continuing to add new conditions on the basis of the accounting for the attorney

26

escrow account and not The Mo Parties' performance itself. For several months after trial, Ng continued to seek Mo's services and personally sent him to Shanghai on his behalf in contradiction of any purported dissatisfaction with Mo during trial.

### B. Ng's Breach of Contract Claim Fails as a Matter of Law

Ng contends that The Mo Firm failed to perform on the retainer agreements.  This defense fails because The Mo Firm followed Ng's direction as he saw fit for the roles of his legal team.

#### i.   The Mo Firm Fully Performed On The Initial Retainer, Supplemental Retainer Agreement, And Additional Terms And Conditions

The evidence will overwhelming show The Mo Firm and Mo's extensive distinctive legal services to Ng in connection with all phases of the pre-trial and post-trial proceedings. This includes the emails, correspondence, and attorney work product. Ng seeks to present evidence through Brafman and Park, none of whom were engaged to represent Ng during the entire pendency of the case.  Brafman was engaged for only six months and Park was engaged for no more than a year. Their testimonies could only be about what they actually did during their limited engagements. All other attorneys separately retained by Ng were each tasked with different aspects of the case. Ng designated The Mo Parties as lead counsel to also oversee their work in addition to performing the legal services under the retainer agreements.

#### ii.   The Mo Parties' Experience And Performance Will Prove The Reasonableness Of Its Fees

Ng contends that The Mo Firm cannot establish the reasonableness of its fees, the reasonable value of its services, or that it has performed work for which it has not already been fully compensated. Ng's own conduct demonstrates otherwise.

The evidence also overwhelmingly demonstrates the reasonableness of the Mo Firm's outstanding $1.9 million owed and the $6 million legal fees.  The value of the fees is also overwhelmingly proven in the evidence, offered by both parties, to show that the Mo Firm fully complied with the Initial Retainer, Supplemental Agreement and Additional Terms and Conditions, all required by Ng.  Ng was fully involved in all aspects of negotiating the terms and conditions of the retainer agreements with The Mo Firm. Ng consulted with Feilan and his daughter in law whose name is included in Ng's handwritten addendum to the Initial Retainer.

The Mo Firm was not engaged until Ng was fully satisfied with the cost of legal services. Prior to signing the Initial Retainer, Ng already had nearly half a dozen American attorneys and law firms he negotiated retainer agreements with and also paid thousands of dollars to on his own accord. Ng also met with Mo several times while at the Metropolitan Detention Center.  Ultimately, Ng and Mo agreed to a fixed fee arrangement, "a common arrangement for criminal defense attorneys." *Jones v. Barnes,* 463 U.S. 745, 761 (1983). And, determining the reasonableness of a fixed fee rests within the District Court's discretion  and, "assessment of a reasonable fee must begin with the agreement itself." *Alderman v. Pan Am World Airways,* 169 F.3d 99, 102 (2d Cir. 1999). The "presence of an agreement between private  parties to pay a flat-fee is a 'strong indication of what said parties believe is the reasonable fee to  be awarded.'" *Broadcast Music, Inc. v. The Living Room Steak House, Inc.,* No. 14-CV-6298,  2016 WL 756567 at *8 (E.D.N.Y. Feb. 26, 2016) (internal citations omitted).

Ng and Mo's discussions for legal representation were reduced to writing -- the Initial Retainer that included Ng's own handwritten notes and demands.  The Supplemental Agreement was also only negotiated and signed after Ng's proposal for fixed fee arrangement and payment schedule was presented and negotiated with Mo. Ng's Additional Terms and Conditions even

further demonstrated how the fees were reasonable to Ng as detailed the areas he wanted The Mo Parties to focus on and he reserved the right to determine the roles of his legal team members.

Ng attempts to liken The Mo Parties' substantive legal services to nothing more than, "the filling of a complaint and attendance at a handful of status conferences." *M. ex rel. P.M. v. Syosset Cent. Sch. Dist.*, CV 11-1402 MKB GRB, 2013 WL 5799908, at *10 (E.D.N.Y. Oct. 25, 2013), *report and recommendation adopted sub nom. C.M. v. Syosset Cent. Sch. Dist.*, 11-CV-1402 MKB, 2013 WL 6157188 (E.D.N.Y. Nov. 22, 2013)(finding contingency attorneys fees excessive when compared to settlement and work done by attorneys). The direct evidence shows otherwise. This Court, in its discretion, will easily determine that the reasonable value of the substantive legal services performed by The Mo Parties was $6 million. *Pichardo v. Koenig*, 112 N.Y.S.3d 424 (App. Term 1st Dep't 2018)(determining the reasonable value of the legal services performed by an attorney in a fee dispute rests with the trial court). *Id.*

Ng relies on cases demonstrating excessive attorneys' fees that are inapposite to his own, with none of them involving six-figure legal fees owed, well-heeled clients such as himself, and an attorney such as Mo who actually performed on the retainer agreements and have sufficient evidence documenting such performance. For example, Ng's reliance on *Koral v. Koral* involving a divorce attorneys' fees is misplaced. *Id.* 185 AD2d 298, 300 (2d Dept 1992). There, the Court found the divorce attorneys' fees excessive because the Court noted that there was, "no evidence. . . [to] ascertain[] precisely how the fee arrangement was reached and whether . . . the sum was reasonable compensation in light of the legal services rendered." *Id.* The Court also noted that the attorney failed to "submit an affidavit of services or any type of documentation establishing the value of the legal services he provided." *Id.* Ng's own handwriting demonstrates how the fee arrangement with The Mo Firm was ascertained.  Ng's notes following the Initial Retainer, his

own payment terms and schedule along with the Additional Terms and Conditions all show how intimately involved he was in determining the fee and also dictating the legal engagement with The Mo Firm.  Ng's reliance on *S.D. v. St. Luke's Cornwall Hosp.*, 63 Misc. 3d 384 (Sup. Ct. Orange County 2019)  is also misplaced. In that case, the Court found that the attorneys' fees were excessive because of the attorney's lack of transparency, an obvious conflict because litigation expenses were funded by a company owned by attorney's brother.  *Id.*

The variety of the substantive legal work and additional services performed by The Mo Firm demonstrates the reasonableness of its fees that is owed by Ng. As the Court is well aware:

> The standard for criminal defense attorneys is not to charge an hourly rate for criminal cases, but rather a flat fee for representation. The amount of the flat fee is normally determined by whether or not the matter is resolved with or without a trial. This flat fee standard recognizes the fact that the preparation and trial of a criminal case requires many disparate tasks and functions for the attorney and support staff. Some may require legal expertise while others may only be ministerial in nature. To charge one hourly rate for all services rendered would not be fair and reasonable to the client. Therefore, the flat fee is the standard accepted by the criminal defense bar.

*People v. Cybulski,* 192 Misc. 2d 442, 561–62 (Co. Ct. 2002).

Mo, was the only bilingual  English and Chinese speaking attorney on Defendant's legal team with over four decades of extensive criminal and international law experience, knowledge, and experience in representing Chinese government and U.N. entities, and has a deep understanding of Chinese business and political institutions, and professional cultural norms. Mo and Ng communicated daily and nearly every aspect of Ng's Case and legal issues had to be handled by The Mo Firm at Ng's direction. As such, for over two and a half years, the Mo Firm was entirely consumed with Ng's Case and was unable to take on any substantive legal

engagements.

      iii.  **Contemporaneous Time Records Are Not Required To Show Reasonableness Of Actual Services Provided In Plaintiff's Fixed Fee Claim**

"The determination of reasonable counsel fees is a matter within the sound discretion of the trial court...." *Shranger v. Shranger,* 537 N.Y.S.2d 84, 85 (3d Dep't. 1989). Even where a "[s]tate law creates the substantive right to attorney's fees, [that] right . . . cannot be deprived by applying the contemporaneous time records rule adopted in this Circuit." *Riordan v. Nationwide Mut. Fire Ins. Co.,* 977 F.2d 47, 53 (2d Cir. 1992)(internal citations omitted). New York courts have routinely rejected and, "decline[d] to adopt such a hard and fast rule that reconstructed time records can never serve as a basis for compensation, or that such detailed time records are necessary in every case." *In re Karp*, 537 N.Y.S.2d 510, 515 (1st Dep't. 1989); *Marion S. Mishkin Law Office v. Lopalo,* 767 F.3d 144, 147 (2d Cir. 2014) (finding "that in cases in which the right to attorneys' fees is governed by state law [such as by contract], New York's more  liberal rule allowing reconstructed records should apply"). In other words, contemporaneous time records are not a prerequisite to demonstrate the reasonableness of a fixed fee claim. Courts have awarded fee claims by evaluating an, "affirmation of legal services, with a record. . . [t]hat  included the dates, hours expended, and nature of the work performed. . . constitu[ting] an  objective and detailed breakdown which, taken together with the information supplied as to the  other factor supporting the fee request, was sufficient to establish the reasonableness of the fees."  *1 Toms Point Lane Corp. v. New York State Div. of Hum. Rts.,* 176 A.D.3d 930, 933 (2019)(internal citations omitted); *see also 126 Mulberry St. Realty Corp. v. Diamond State Ins.  Co.,* No. 07-CV-205, 2010 WL 11710636, at *2 (S.D.N.Y. Nov. 1, 2010) (holding that attorney's  fees should be awarded even though counsel, "did not submit actual contemporaneous time  records" because

"[a] review of the submissions made by [the attorneys] shows that they made  contemporaneous entries as the work was completed, and that their billing was based on these  contemporaneous records"); *In re CIT Bank, N.A., 2017 U.S. Dist. LEXIS 29134* (E.D.N.Y. Feb. 28, 2017)(recommending the award of reasonable fixed-fee attorney's fees without  supporting contemporaneous time sheets.)

The Mo Firm's evidence includes contemporaneous documents that show the substantive legal services that $1.9 million remains unpaid.  Ng contends that because The Mo Firm did not maintain contemporaneous time records, the value of the services or reasonableness cannot be established.  However, such time records are not required to demonstrate the reasonableness of the fixed fee and remaining unpaid balance to The Mo Firm.  Notably, Brafman also did not keep contemporaneous time records during his mere half year of representing Ng but testified that he had an approximate idea of how much time he worked on a matter with his contemporaneous notes. (Brafman Dep. Pg. 55-58, Oct. 7, 2021).

Accordingly, Supplemental Agreement alone not only demonstrates the parties' mutual agreement to its terms – the $5 million total fixed fee – but also the reasonable value of the Mo Firm's legal  services that were actually performed in support of the fixed fee claim of $1.9 million that  remains unpaid.

## <u>CONCLUSION</u>

For all the foregoing reasons, The Mo Firm's requests should be granted in their entirety.


Dated:  New York, New York
        September 6, 2022

                            THE LAW FIRM OF HUGH H. MO, P.C.



                            BY: _____/s_____
                                    Hugh H. Mo
                                    Elizabeth L. Mo
                                    Hin Ton Wong
                                    225 Broadway, 27th Floor
                                    New York, New York 10007
                                    (212) 385-1500

                                    *Attorneys for Plaintiff and Counterclaimant*
                                    *The Law Firm of Hugh H. Mo, P.C. and*
                                    *Hugh H. Mo*