UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------- X
                                                                  :
THE LAW FIRM OF HUGH H. MO, P.C..,                                :
                                                                  :
                                      Plaintiff,                  :        20 Civ. 7077 (AKH)
           v.                                                     :
                                                                  :
NG LAP SENG a/k/a DAVID NG,                                       :
                                                                  :
                                      Defendant.                  :
                                                                  :
                                                                  :
----------------------------------------------------------------- X

ALVIN K. HELLERSTEIN, U.S.D.J.:

FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING A BENCH TRIAL

Plaintiff, the Law Firm of Hugh H. Mo, P.C. ("Mo") filed suit against Defendant NG Lap Seng a/k/a David Ng ("Ng") for the balance due on a retainer agreement, $1.9 Million. Ng denied liability and filed a counterclaim against Plaintiff and Mo individually for the return of moneys paid to Mo under that retainer agreement, $4.1 million. A jury was not requested.

I tried the case on half-days, on September 19, 20, 21, October 3, 19, 20, and November 4, 14 and 21, 2022. Following are my findings of fact and conclusions of law. I grant judgment to Mo and dismiss Ng's counterclaim.

FINDINGS OF FACT

*Background*

1. Mo is a professional corporation organized under the laws of the State of New York with an office at 225 Broadway, 27th Floor, New York, New York 10007. Hugh H. Mo was admitted to practice in New York State in June 1977, and has been practicing since then, mostly representing Chinese businessmen in Commercial and Criminal litigation.

2. Ng is a citizen of Macau, Special Administrative Region ("SAR") of the People's Republic of China, and maintains his residence in Macau, SAR.

*The Initial Retainer*

3. Ng was arrested on October 6, 2015, in New York City, and thereafter indicted in the United States District Court of the Southern District of New York of conspiracy to bribe, and bribing, UN officials, money laundering and conspiracy to violate the Foreign Corrupt Practices Act. *See United States v. Ng. Lap* Seng, et al., Case No. 15-cr-706

(VSB) (S5) ("the Criminal Action"). Trial began June 26, 2017. On July 27, 2017, Ng was convicted of all the six counts in the fifth superseding indictment.

4. Ng retained Benjamin Brafman and his firm, Brafman & Associates, P.C. ("Brafman") On September 25, 2015, to represent him, pursuant to a retainer agreement to pay Brafman $2,000,000 through all pre-trial proceedings.

5. Initial efforts to release Ng from detention did not succeed. On October 8, 2015, Ng retained Mo to act as lead counsel and co-counsel with Brafman for a fixed fee of $1 million to seek Ng's release from detention under a bail package to be negotiated.

6. Under Mo's retainer agreement, Mo was to familiarize himself with all the aspects of the case, with all of Ng's history and activities, and defend Ng along with "other lawyers that [Ng] separately retained at [his] own expense." At the time, Ng had retained, not only Brafman, but also four lawyers of Orrick Herrington & Sutcliffe LLP, Frederick Tung, Kevin Kerveng Tung, Guy D. Singer and Jonathan E. Lopez. Ng also instructed Mo to visit Ng daily, to keep Ng up to date with developments in the case, and to serve as a liaison between him and others who Ng thought could be of assistance in his case.

7. Ng is a sophisticated businessman with experience working with, and paying for the services of, other American lawyers. Ng understood the terms of the retainer agreement and agreed to its terms. Ng understood that Mo's fee was higher than prevailing rates among trial lawyers of high standing in New York City and agreed to pay it to obtain Mo's unique services— his criminal law experience in New York City, his standing in the Bar, and, most important, his ability to translate American law practices to Ng, and to explain Ng's history, activities and instructions to the other lawyers representing him.

*The Supplemental Agreement*

8. On November 1, 2015, Ng had Mo enter into a Supplemental Agreement. The agreement provided that Ng would pay Mo $2 million "for all legal services related to pre-trial proceedings, including but not limited to investigation, interviews of [Ng] and all prospective witnesses, meetings with the government prosecutors and co-counsel, all court appearances, discovery, motion practices, hearings and trial preparation." Ng paid Mo $1 million on November 10, 2015, and $1 million on December 7, 2015.

9. The Supplemental Agreement also provided that if Ng's case were tried, Ng would pay Mo an additional fee of $3 million for the trial and for post-conviction services, including preparation of a sentencing memorandum and the sentencing hearing.

10. On November 16, 2015, Ng drafted six additional terms and conditions in Chinese titled, "Ng Lap Seng Terms and Conditions for Attorneys' Retainer Agreements" ("Additional Terms and Conditions"), that were incorporated and made a part of the Supplemental Agreement.

11. These six Additional Terms and Conditions were directed to Mo Firm and Brafman, to be thoroughly familiar with (1) Ng's personal history and background; (2) history of South-

South News Inc. (a U.N. news agency founded and funded by Ng); (3) background of the proposed U.N. permanent expo and conference center project in Macau; (4) history and development of the United Nation Office of South-South Cooperation, U.N. Group of 77, plus China and 133 South-South member states; (5) relationship between and among the four named co-defendants with Ng; and (6) the government's case against Ng and all viable defenses.

12. Pursuant to the Supplemental Agreement, on behalf of Ng, Mo retained additional counsel for the trial.

    a. On April 19, 2016, Ng engaged Tai Park ("Park"), then of Park Jensen Bennett, LLP (PJB), to serve alongside Mo as trial counsel. Ng paid PJB's initial fixed fee of $800,000, and then paid another $300,000 pursuant to a supplemental retainer agreement. After trial, Ng paid Park an additional $200,000. In total Ng paid PJB $1.3 million.

    b. On June 20, 2016, Mo retained Shapiro Arato LLP ("Shapiro Arato"). Ng paid Shapiro Arato its hourly fees, totaling approximately $1,248,000.

    c. On July 1, 2016, Mo retained Sills Cummis & Gross ("Sills Cummis") as Special Counsel to assist the Mo firm in its representation of Ng, in part by providing the Mo firm with advice about how to handle the international law dimensions of Ng's case. Ng paid Sills Cummis its hourly fees, totaling $226,447.

    d. On or about January 2017, Ng, retained Viet D. Dinh ("Dinh"), a partner of Kirkland & Ellis LLP ("K&E"). K&E attended the trial and represented Ng through sentencing. Ng paid K&E $1.3 million.

13. On April 12, 2016, Brafman resigned from the defense team and returned $500,000 from his $2 million retainer.

14. Ng actively assigned roles to the different members of his defense team and changed those roles at various times. Ng did not change Mo's position as lead counsel, to coordinate the services of the other attorneys, to provide information about Ng necessary for their services, to advise Ng as events happened and as the other attorneys advised, and to provide Ng's instructions to the defense team. Mo's skills and experience were unique in relation to Ng's needs. Mo also oversaw South-South News's compliance with a grand jury investigation.

15. Mo made his office available to Ng on a near daily basis and gave substantial time to hear and advise Ng. He prepared Ng to testify if it became appropriate for him to do so. He participated in voir dire and challenges of jurors, preparation of witnesses and of cross-examination strategy of anticipated government witnesses, and attended every day of trial as one of Ng's counsel, sitting next to Ng at counsel's bench to provide a link between Ng, as client, and Tai Park, trial counsel.

16. Prior to trial, after Ng rejected a government plea offer, Ng instructed Mo to work with the defense team to seek governmental intervention because of Ng's work and relations

3

with the United Nations and the Republic of China. Mo provided the factual information and provided the link between Ng and his defense team to produce three "white papers" by attorneys Deborah Struman, Abraham Sofaer, and Arthur Miller to support Mr. Ng's sovereign immunity defense. The efforts were not successful. Mo also met with Chinese consular officials in New York and government officials in China in an effort to persuade the Chinese government to intervene on Ng's behalf. All these efforts were not successful.

17. Ng did not express dissatisfaction with Mo's services before or during trial, or redefine Mo's responsibility as lead counsel, even though Ng chose Park to give the opening and closing and conduct the bulk of the trial work.

18. Ng's testimony, that he was not aware that Park and his staff performed the bulk of trial services is not credible. Mo chose Park after both he and Mo gave mock opening statements, stating that Park, because he had been an Assistant U.S attorney for the Southern District of New York and was a Korean-American rather than a Chinese-American, would be better suited to the role. Ng was in court and saw, at every stage of the case, who was doing the bulk of the work and who was presenting the case to the judge and jury and nevertheless did not change Mo's responsibility as lead counsel until after the verdict.

19. After the verdict, Ng continued to engage Mo to assist Kirkland & Ellis during post-verdict and sentencing proceedings, and to travel to Shanghai, China to secure a declaration (from Director of United Nations Office for South-South Cooperation Zhou Yiping) to support the sentencing memorandum. At Ng's request, Mo met with Chinese officials and secured visits by Chinese consular officials to Ng at Ng's apartment.

20. Ng paid Mo $1 million of Mo's $3 million fee, between December 13, 2016, and July 25, 2017, and an additional $100,000 on July 31, 2017, leaving an unpaid balance of $1.9 million under the Supplemental Agreement. On July 31, 2017, and August 16, 2017, Mo sent invoices in the amount of $1.9 million to Ng and his daughter Feilan. In a meeting in November 2017, Ng acknowledged that he owed Mo $1.9 million, and fees and expenses of Mo's other lawyers, but asked Mo to wait to receive those funds until the funds from his $20 million cash bail fund had been released.

21. Ng promised to pay the balance to Mo to induce him to provide his required signature to release the cash bail of $20 million and instructed K&E to pay open fee balances to itself, Mo and all other defense counsel.

22. On August 1, 2018, Ng's daughter Feilan sent an email to Mo stating that Ng had agreed to ask Kirkland & Ellis, who was overseeing distributions of Ng's $20 million cash bail fund, to distribute $1.9 million to Mo as soon as the bond money was released. Mo then agreed to provide his signature.

23. K&E, at the instructions of Ng, failed to pay Mo the $1.9 million owed him. In consequence, he filed this lawsuit. Ng then counterclaimed to recover all the money it paid to Mo, $4.1 million.

CONCLUSIONS OF LAW

*Jurisdiction*

24. The court has personal and subject matter jurisdiction.  Mo and Ng have diverse citizenship, and the matter in controversy exceeds $75,000, exclusive of interest and costs. Ng contracted for legal services, and legal services were provided in New York, and this lawsuit arose out of that contract. 28 U.S.C. 1332; NY CPLR 302.  Jurisdiction is not disputed.

*Plaintiff's Breach of Contract Claim*

25. In order to prevail on his breach of contract claim, Mo must prove that (1) Mo and Ng executed an enforceable retainer agreement, (2) Mo performed professional services under that agreement, and (3) Ng failed to pay for the services, causing damages. *See* 1B Carmody-Wait 2d § 3:480 (citing *Hyman v. Burgess*, 125 A.D.3d 1213, 4 N.Y.S.3d 645 (3d Dep't 2015); *see also Newman & Schwartz v. Asplundh Tree Expert Co., Inc.*, 102 F.3d 660, 662 (2d Cir. 1996) (finding that law firm's complaint alleging breach of contract stated a claim).  Ng's defense is that Mo did not provide sufficient legal services, in quantity or quality, to justify the fee he had promised to pay Mo.

26. Courts typically refrain from examining the adequacy of consideration. However if a court determines that an attorney's fee is unfair, unreasonable, or not fully known or understood by the client, the court may hold that the fee is invalid, "unless [plaintiff] can show that the client was fully aware of the consequences and that there was no exploitation of the client's confidence in the attorney." *See Ween v. Dow*, 35 A.D.3d 58, 62 (1st Dep't 2006); New York Rule of Professional Conduct 1.5(a) (describing a lawyer's ethical obligation not to charge excessively high fees); *Shranger v. Shranger*, 537 N.Y.S.2d 84, 85 (3d Dep't. 1989) ("The determination of reasonable counsel fees is a matter within the sound discretion of the trial court...."); *Pichardo v. Koenig*, 112 N.Y.S.3d 424 (App. Term 1st Dep't 2018). ("As a matter of public policy, courts pay particular attention to the fee arrangement between attorneys and their clients.").

27. Mo has the burden to demonstrate what work he performed and to establish the value of that work. *See Pichardo v. Koenig*, 112 N.Y.S.3d 424 (App. Term 1st Dep't 2018) ("[I]t is the attorney who must shoulder the burden of demonstrating the fair and reasonable value of the services rendered.").

28. Mo did not maintain contemporary time records.  However, Mo has provided sufficient evidence to prove that he performed the services that he was required to perform pursuant to the retainer agreements.  Mo's diary entries of meetings with Ng, hundreds of emails from Mo to Ng, Ng's agents, members of Ng's defense team, officials from the U.S. and Chinese governments and various others associated with Ng's case, and Mo's testimony regarding the work he performed are sufficient to prove his work. *See* New York State Bar Association Committee on Professional Ethics Opinion 1202 (10/01/2020) (Stating that courts can find that a fixed fee reasonable "in matters frequently performed by the lawyer, where it is possible for the lawyer to accurately estimate the cost of performing

the services."). *See also In re Karp,* 537 N.Y.S.2d 510, 515 (1st Dep't. 1989) (noting that New York courts have "decline[d] to adopt such a hard and fast rule that reconstructed time records can never serve as a basis for compensation, or that such detailed time records are necessary in every case."); *Marion S. Mishkin Law Office v. Lopalo,* 767 F.3d 144, 147 (2d Cir. 2014) (finding "that in cases in which the right to attorneys' fees is governed by state law, New York's more liberal rule allowing reconstructed records should apply"); *In re CIT Bank, N.A.,* 2017 U.S. Dist. LEXIS 29134 (E.D.N.Y. Feb. 28, 2017) (recommending the award of reasonable fixed-fee attorney's fees without supporting contemporaneous time sheets.). Even though they are re-constructions and thus not entirely accurate, Mo's reconstructed timesheets show that Mo worked approximately 2,309.3 hours on Ng's case from October 10, 2015, to July 18, 2018.  The hours Mo's reconstruction show, at the value of $2,500/hour that Mo assigns to them, comes out to $5,777,250.00. At $1000/hour, the hours come out to $2,309,300.

29. Although Mo's fee was higher than other lawyers in the case, Mo services were unique, and the fee he charged for those services was not excessive. New York Rule of Professional Conduct 1.5. (A lawyer's fee is excessive when "after a review of the facts, a reasonable lawyer would be left with a definite and firm conviction that the fee is excessive.").

30. The fixed-fees Mo charged Ng were reasonable at the time the parties signed the Initial Retainer and Supplemental Agreements. *Broadcast Music, Inc. v. The Living Room Steak House, Inc.,* No. 14-CV-6298, 2016 WL 756567 at *8 (E.D.N.Y. Feb. 26, 2016) (The "presence of an agreement between private parties to pay a flat-fee is a 'strong indication of what said parties believe is the reasonable fee to be awarded.'"). The fixed fee provided benefits to Ng "since [Ng] kn[ew] in advance the cost of the services and [wa]s not subject to inefficiencies that may increase the fee in the case of hourly billing." New York State Bar Association Committee on Professional Ethics Opinion 1202 (10/01/2020).

31. The fixed fee does not appear unreasonable or unconscionable when seen in hindsight because, although high, 'the amount [was not] high enough to be out of all proportion to the value of the services rendered.'" *McDonald ex rel Prendergast v. Pension Plan of the NYSA-ILA Pension Tr. Fund,* 450 F.3d 91, 96 (2d Cir. 2006).  The following factors support the court's finding of reasonableness.

   a. The services Mo provided required Mo to work at Ng's behest for the entire period he was retained. During that period Mo worked as Ng's lead counsel, a position he was uniquely suited to perform because Ng and Mo shared language and cultural affinities, and because he had criminal defense experience as a defense lawyer and former Assistant District Attorney.  These traits enabled Ng to understand the issues and strategies of his defense, and enabled him to instruct his lawyers through Mo's role as lead counsel. *See* NYRPC 1.5(1) (When determining the reasonableness of fees, Courts should consider, *inter alia,* "the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.").

b.  Ng had retained, and thereafter retained, expensive and experience counsel. He knew that he was in great trouble, and had the wealth to retain numerous counsel to defend him. He willingly agreed to pay Mo's retainer, knowing that it was higher than any other lawyer in the case, because Mo filled a need no other lawyer could fill. He understood that Mo had to turn down other work in order to dedicate himself to Ng's case. *See* NYRPC 1.5(2) (When determining the reasonableness of fees, Courts should consider, *inter alia*, "the likelihood, if apparent or made known to the client, that the acceptance of the particular employment will preclude other employment by the lawyer."). Ng knowingly executed both The Initial Retainer agreement and the Supplemental Retainer Agreement, and added conditions to the Supplemental Agreement, and there is no sufficient reason that they should not be enforced as binding agreements.

c.  Ng acknowledged that he owed Mo $1.9 million dollars, and induced Mo's agreement to release Ng's $20 million cash bail by promising to pay Mo the $1.9 million balance owed to Mo.

32. Ng breached the Supplemental Agreement by failing and refusing to pay Mo the outstanding balance of $1.9 million owed Mo.

*Plaintiff's Account Stated Claim*

33. In addition to Plaintiff's breach of contract claim, Plaintiff also brings an account stated claim. A claim for an account stated may relate to bills for legal fees. See *Kramer, Levin, Nessen, Kamin & Frankel*, 638 F Supp at 719 (1986) *quoting Rodkinson v. Haecker*, 248 N.Y. 480 (1928) (finding that an account stated claim existed against client to recover outstanding attorney's fees).

34. Mo presented an account for $1.9 million to Ng; Ng accepted this account as correct; made no objections within the first five months after receiving the account or any other reasonable time; and promised on multiple occasions to pay Mo.

35. An account stated claim provides an alternative basis of recovery. See *Camacho Mauro Mulholland LLP v. Ocean Risk Retention Grp, Inc.*, No. 09 Civ. 9114, 2010 WL 2159200, at *2 (S.D.N.Y. May 26, 2010) (Explaining that, in New York, to prevail on an account stated claim, a plaintiff must show that: "(1) an account was presented; (2) it was accepted as correct; and (3) [the] debtor promised to pay the amount stated.") (internal citations omitted); *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 679 F.Supp.2d at 411 ("[t]he second and third requirements . . . may be implied if 'a party receiving a statement of account keeps it without objecting to it within a reasonable time or if the debtor makes partial payment.'") (*quoting LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 64 (2d Cir. 1999)).

36. Mo relied on Ng's promise to pay Mo, through K&E, if Mo agreed that Ng's cash bail should be paid to K&E, for payment of K&E's and all other lawyers' claims for legal services.

*Defendant's Breach of Contract Claim Against The Mo Firm*

37. Defendant counterclaims that The Mo Firm breached its contract by failing to perform the services agreed to under the Initial Retainer and the Supplemental Agreement.

38. Mo performed the services that Mo was required to perform under the Initial Retainer Agreement and the Supplemental Retainer Agreement. Mo knowingly sought out Mo; knowingly agreed to pay him the amounts he requested; and knew the nature and extent of Mo's services. Mo's fee, although high, is not unreasonable under the circumstances.

39. Ng has failed to prove a claim for breach of contract.

*Defendant's Fraudulent Inducement Claim Against Mo and The Mo Firm*

40. Defendant counterclaims that Mo fraudulently induced Ng to enter into the retainer agreements. Ng contends that he was fraudulently induced by Mo's representations about his background, experience, and ability to handle Ng's Case and that Mo outsourced all of the legal work to other attorneys.

41. Mo did not misrepresent his ability to represent Ng, and provided, and coordinated, the many services Ng requested of the many counsel he retained. Ng retained expensive and experienced counsel before, during and after his trial, in addition to Mo. Ng did not raise any significant complaints about the services that Mo provided.

42. There is no evidence that Mo made a false representation or intended to defraud Ng.

43. Defendant has failed to prove with clear and convincing evidence that Mo committed fraud under New York Law.

CONCLUSION

The Clerk shall enter judgment in favor of The Law Firm of Hugh H. Mo in the amount of $1,900,000 with interest from September 12, 2018, the day K&E received the Cash Bail Funds, plus costs to be taxed by the Clerk. The Clerk also shall enter judgment dismissing the counterclaims alleged against The Law Firm of Hugh H. Mo and against Hugh H. Mo, and tax any additional costs.

SO ORDERED.

Dated:      December /, 2022
            New York, New York

            ALVIN K. HELLERSTEIN
            United States District Judge